## KIDD *v.* PEARSON.

ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 779. Argued and submitted April 4, 1888. — Decided October 22, 1888.

Following *Mugler* v. *Kansas*, 123 U. S. 623; *Held*, that a State has the right to prohibit or restrict the manufacture of intoxicating liquors within its limits; to prohibit all sale and traffic in them in the State; to inflict penalties for such manufacture and sale; and to provide regulations for the abatement, as a common nuisance, of the property used for such forbidden purposes; and that such legislation does not abridge the liberties or immunities of citizens of the United States, nor deprive any person of property without due process of law, nor contravene the provisions of the Fourteenth Amendment of the Constitution of the United States.

A statute of a State which provides (1) that foreign intoxicating liquors may be imported into the State, and there kept for sale by the importer, in the original packages, or for transportation in such packages and sale beyond the limits of the State; and (2) that intoxicating liquors may be manufactured and sold within the State for mechanical, medicinal, culinary, and sacramental purposes, but for no other, not even for the purpose of transportation beyond the limits of the State — does not conflict with Section 8, Article 1, of the Constitution of the United States by undertaking to regulate commerce among the States. ·

The right of a State to enact a statute prohibiting the manufacture of intoxicating liquors within its limits, is not affected by the fact that the manufacturer of such spirits intends to export them when manufactured.

The police power of a State is as broad and plenary as the taxing power (as defined in *Coe* v. *Errol*, 116 U. S. 517), and property within the State is subject to the operation of the former, so long as it is within the regulating restrictions of the latter.

THE case, as stated by the court, was as follows:

This is a writ of error to the Supreme Court of the State of Iowa, allowed by the Chief Justice thereof, upon the ground that the judgment in the case affirmed the validity of a statute of that State, which the plaintiff in error claimed to be in conflict with the Federal Constitution. The case arose upon a petition in equity, filed December 24, 1885, in the Circuit Court of Polk County, Iowa, by defendants in error, I. E. Pearson and S. J. Loughran against the plaintiff in error, J. S. Kidd, praying that a certain distillery erected and used by said Kidd for the unlawful manufacture and sale of intoxicating liquors be abated as a nuisance; and that the said Kidd be perpetually enjoined from the manufacture therein of all intoxicating liquors. The provisions of the law under which these proceedings were instituted are found in Chapter 6, Title 11, of the Code of Iowa, amended by Chapter 143 of the acts of the General Assembly in 1884. The sections necessary to be quoted for the purposes of this decision are as follows:

Section 1523 provides: "No person shall manufacture or sell by himself, his clerk, steward, or agent, directly or indirectly, any intoxicating liquors, except as hereinafter provided. And the keeping of intoxicating liquors, with the intent on the part of the owner thereof, or any person acting under his authority or by his permission, to sell the same within this State contrary to the provisions of this chapter, is hereby prohibited, and the intoxicating liquor so kept, together with the vessels in which it is contained, is declared a nuisance, and shall be forfeited and dealt with as hereinafter provided."

Section 1524 provides: "Nothing in this chapter shall be construed to forbid the sale by the importer thereof of foreign intoxicating liquor imported under the authority of the laws of the United States regarding the importation of such liquors and in accordance with such laws: *Provided*, That the said liquor at the time of said sale by said importer remains in the original casks or packages in which it was by him imported, and in quantities not less than the quantities in which the laws of the United States require such liquors to be imported, and is

sold by him in said original casks or packages and in said quantities only; and nothing contained in this law shall prevent any persons from manufacturing in this State liquors for the purpose of being sold, according to the provisions of this chapter, to be used for mechanical, medicinal, culinary, or sacramental purposes."

Section 1525 prescribes a penalty for a violation of the law by manufacturers, as follows: "Every person who shall manufacture any intoxicating liquors as in this chapter prohibited, shall be deemed guilty of a misdemeanor, and upon his first conviction for said offence shall pay a fine of two hundred dollars and costs of prosecution, or be imprisoned in the county jail not to exceed six months; and on his second and every subsequent conviction for said offence he shall pay a fine of not less than five hundred dollars, nor more than one thousand dollars, and costs of prosecution, and be imprisoned in the county jail one year."

Section 1526 defines who may be permitted to manufacture under the law, and for what purpose the manufacture may be carried on, as follows: "Any citizen of the State, except hotel keepers, keepers of saloons, eating houses, grocery keepers, and confectioners, is hereby permitted, within the county of his residence, to manufacture or buy and sell intoxicating liquors for mechanical, medicinal, culinary, and sacramental purposes only, provided he shall first obtain permission from the board of supervisors of the county in which such business is conducted, as follows."

Sections 1527 and 1529 provide for the manner of obtaining the permit and § 1530 sets out the conditions under which it may be granted. It is as follows: "At such final hearing, any resident of the county may appear and show cause why such permit should not be granted; and the same shall be refused, unless the board shall be fully satisfied that the requirements of the law have, in all respects, been fully complied with, that the applicant is a person of good moral character, and that, taking into consideration the wants of the locality, and the number of permits already granted, such permit would be necessary and proper for the accommodation of the neighborhood."

The manufacturer, like the seller, is required to make monthly reports to the county auditor, the evident purpose of the requirement being to show whether or not the holder of a permit was manufacturing or selling in compliance with the law.

Section 1543 provides for proceedings in equity to abate and enjoin unlawful manufacture.

The averments of the petition are, in substance, that the distillery described therein was erected by said J. S. Kidd for the manufacture of intoxicating liquors, contrary to the statute of Iowa; that said Kidd had been, ever since the 4th of July, 1884, and is still, engaged in the manufacture of intoxicating liquors, upon the premises aforesaid, for other than mechanical, medicinal, culinary, and sacramental purposes; with the concluding averment "that the defendant manufactures, keeps for sale, and sells within this State, and at the place aforesaid, intoxicating liquors, to be taken out of that State and there used as a beverage, and for other purposes than for mechanical, medicinal, culinary, and sacramental purposes, contrary to the statute of Iowa."

Kidd in his answer specifically pleaded that he is now, and has been ever since the 4th of July, 1884, authorized by the board of supervisors to manufacture and sell intoxicating liquors, except as prohibited by law, and that, in the manufacture and sale of liquors, this defendant has at all times complied with the requirements of the law in that behalf. Upon the trial it was proved by undisputed evidence that Kidd held each year, from July 4th, 1884, a permit regularly issued from the board of supervisors of Polk County, covering the period of the alleged violations of law, authorizing him to manufacture and sell intoxicating liquors for mechanical, medicinal, culinary, and sacramental purposes; that his monthly reports, made on oath, in compliance with the requirements of the law, show that there were no sales for mechanical, medicinal, culinary, and sacramental, or any other purpose, in the State of Iowa; and that all the manufactured liquors were for exportation and were sold outside of the State of Iowa. A decree was rendered against Kidd, ordering that the said dis-

tillery be abated as a nuisance, according to the prayer of the petitioner, and enjoining said Kidd from the manufacture therein of any and all intoxicating liquors. On appeal to the Supreme Court of Iowa this decree was affirmed by that court. Hence this writ of error.

*Mr. F. W. Lehmann* for plaintiff in error. *Mr. Benjamin Harris Brewster* was with him on the brief.

Alcohol is universally admitted to be a useful and indispensable commodity. For some purpose and to some extent, as a prime or subordinate element, it is used in nearly every art and manufacture. Next to water it is the most general solvent. In the manufacture of chemicals and drugs it is absolutely indispensable. The whole art of pharmacy, it may be said, is based upon the use of alcohol as a solvent.

It enters largely into the composition of paints, varnishes, perfumes, fine soaps, stearine candles, and many other articles of daily use. It is used in all dyeing and lacquering establishments, as a preservative in all museums, and as a fuel and cleansing material by jewellers, dentists, photographers and many other workers in mechanical arts. Its many beneficial uses in the sick room are well known and need not be recited.

The amount of alcohol annually required in this country for these and other like legitimate uses is variously estimated by good authorities at from nine to twenty millions of gallons.

The laws of every State in the Union and of every civilized country recognize the beneficial properties of alcohol, and all legislation touching the subject, whether prohibitory or restrictive merely, deals only with intoxicating liquors designed for use as a beverage.

The statute of Iowa which is in question makes no distinction between alcohol and intoxicating drinks.

The question presented by this case is, can a State prohibit traffic with other States and foreign countries in an article which it recognizes to be a useful commodity and the subject of lawful traffic among its own people?

It is not in the power of a State to prohibit exportation of any commodity whatever. Section 8, of Art. 1, of the Fed-

eral Constitution, provides: "The Congress shall have power to regulate commerce with foreign nations and among the several States."

As to certain subjects which are local in their nature, and affect commerce but incidentally, the State may make proper regulations, until Congress acts with reference to them. Where, however, the subject is national in its character, or of such nature as to admit of uniformity of regulation, the power of Congress is exclusive of all state authority. *Welton* v. *Missouri*, 91 U. S. 275; *County of Mobile* v. *Kimball*, 102 U. S. 691.

That portion of commerce with foreign countries and between the States which consists in the transportation and exchange of commodities is of national importance, and admits and requires uniformity of regulation. *Welton* v. *Missouri*, *supra; County of Mobile* v. *Kimball*, *supra; Brown* v. *Houston*, 114 U. S. 622.

The non-exercise of its power by Congress is tantamount to a declaration that such commerce shall be free. *Wabash, &c. Railway Co.* v. *Illinois*, 118 U. S. 557. We have only to consider, then, whether commerce in alcohol is included within the term "commerce" as used in the Constitution.

In the *Passenger Cases*, 7 How. at page 416, it is said: "Commerce consists in selling the superfluity; in purchasing articles of necessity, as well productions as manufactures; in buying from one nation and selling to another, or in transporting the merchandise from the seller to the buyer to gain the freight."

In *Welton* v. *Missouri*, *supra*, it is said that "the main object of that (inter-state) commerce is the sale and exchange of commodities."

No exceptions are admitted to this general character of commerce, as to the articles which may enter into it. Every species of property, everything which has beneficial uses and exchangeable value, is included. That alcohol is property, that it has value in use and exchange, is everywhere admitted.

In the *License Cases*, 5 How. 504, all the judges concurred in treating alcohol as property and commerce in it, as much as commerce in any other commodity, when carried on among

the States or with foreign countries, as within the scope of the constitutional provision. Chief Justice Taney and those concurring with him did indeed hold that the laws involved regulated commerce as between the States, and that regulations of that character might be made by the States so long as Congress failed to act. This, in view of later decisions, was not tenable ground. The other judges sustained the laws as to liquors brought from other States upon the same ground as that upon which they sustained the laws as to imported liquors, viz.: That they were domestic regulations purely, and affected only domestic commerce.

That intoxicating liquors are property and traffic in them as much as in any other species of property within the meaning of the term "commerce" in the Federal Constitution is plainly implied in *Beer Co.* v. *Massachusetts*, 97 U. S. 25. The Supreme Court of Iowa itself, in deciding a case arising under the very law in question, laid down the same doctrine. *Monty* v. *Arenson*, 25 Iowa, 383.

Commerce in alcohol being within the constitutional provision, it remains to determine how far that provision is operative as a limitation upon the power of the States.

The *License Cases* settled that a State could not, in virtue of its police power, prohibit importation of liquors from foreign lands, and the several States have since that time framed their enactments in this view. Imported liquors are not, as a consequence, exempted from all police supervision, but the power of Congress and the power of the States are each given effect within their respective spheres. So long as the liquors retain their character as imports they are under the authority of Congress; when they lose that character and become mingled with the general property of the State they become subject to its police restrictions.

Imports and exports stand upon the same footing. No warrant for any distinction between them can be found in either the letter or the reason of the constitutional provision.

In *Gibbons* v. *Ogden*, 9 Wheat. 1, Ch. J. Marshall said:

"It has, we believe, been universally admitted that these words (commerce with foreign nations, etc.) comprehend every

species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend. It has been truly said that commerce, as the word is used in the Constitution, is a unit, every part of which is indicated by the term," pp. 193–4.

Yet the Iowa statute absolutely prohibits the exportation of the product of one of its lawful manufactures, or at least attempts to restrict its sale abroad by a limitation of the uses for which it may be there sold.

Whatever doubt may have once existed on the subject, it is now a settled doctrine that as to the paramount authority of Congress commerce among the several States stands upon the same footing as commerce with foreign nations.

The States may not in the exercise of their many undoubted powers to tax, to pass quarantine and inspection laws, and other needful measures of internal police, trench upon this authority. There is involved in this no impairment of the power of the States over purely domestic concerns, but there is involved and required by it a limitation of state interference to purely domestic concerns

A consideration of some of the leading cases in which there was either a real or supposed conflict of state and national authority will serve to point out the rightful limits of each. [Counsel then referred (with comments and quotations) to *Gibbons* v. *Ogden, supra; Almy* v. *California,* 24 How. 169; *State Freight Tax,* 15 Wall. 232; *State Tax on Railway Gross Receipts,* 15 Wall. 284, as affected by *Philadelphia, &c. Steamship Co.* v. *Pennsylvania,* 122 U. S. 326; *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489; *Hall* v. *De Cuir,* 95 U. S. 485; *Western Union Tel. Co.* v. *Pendleton,* 122 U. S. 347; *Tiernan* v. *Rinker,* 102 U. S. 123; *Walling* v. *Michigan,* 116 U. S. 446; *Railroad Co.* v. *Husen,* 95 U. S. 465; *City of New York* v. *Miln,* 11 Pet. 102; *Chy Lung* v. *Freeman,* 92 U. S. 275; *People* v. *Compagnie Générale,* 107 U. S. 59.]

None of these cases were overruled by *Mugler* v. *Kansas* 123 U. S. 623. The commercial power of Congress was not involved in them. The point ruled was simply that the Four-

teenth Article of Amendment did not operate to impair the police power of the States. The doctrine of the *Husen Case*, that the States under cover of exerting their police powers, may not substantially prohibit or burden inter-state or foreign commerce, was not denied.

Under the laws of Iowa, intoxicating liquors are not *per se* a nuisance. The mere possession of them is not a crime. To make the possession criminal, it is essential that it be with intent to sell them *within the State.*

Alcohol not being *per se* a nuisance, but recognized as property and as the subject of lawful commerce by the laws of the United States and of every State in the Union, to prohibit its transportation from one State, by one who has the legal right there to own and keep it, to another State, with intent there to sell it to a person and for a purpose authorized by the laws of that State, is to prohibit, to that extent, commerce among the States. It is prohibiting "the transmission of subjects of trade from the State to the buyer, or from the place of production to the market," which this court said, in the case of the State Freight Tax, it was absurd to suppose, was not contemplated by the Constitution, "for without that there could be no consummated trade either with foreign nations or among the States."

The peculiar quality of the commodity does not affect the constitutional principles involved. All commodities are subject to a proper exercise of the police power of the States, and all commodities in their relation to inter-state and foreign commerce are subject to the paramount and exclusive authority of Congress. The shipment of liquors from without the State to within it, was, in *Walling* v. *Michigan*, held to be a matter of commerce among the States, and we take it for granted that a shipment from within to without the State is no less so. The rule of law applicable does not depend upon the direction of the shipment, and change as that changes. It will be said, however, that the question in this case is not whether the alcohol after it was manufactured could be shipped from the State, but whether it could be manufactured for the purpose of so shipping it. The difference suggested is one of form,

and not of substance. The manufacture of alcohol was not *per se* illegal. It was expressly authorized by the law. Now, unless the shipment was itself illegal, how could it make the manufacture so ?  Two acts, each lawful in itself, are not made unlawful when brought into conjunction, simply because of that conjunction. The act of transporting the alcohol from the State in the course of lawful commerce with other States not being a crime, the intent to perform that act was not a criminal intent, no matter when formed, whether before or after the alcohol was manufactured. If in the operation of this distillery there was a crime committed, it was committed by doing a lawful act, by lawful means, for lawful purposes. Such a conclusion discredits the premises from which it is derived. We confidently submit that Mr. Kidd could not, by force of the Iowa statute, be enjoined from the further pursuit of his business unless he had, either in the manufacture or in the sale of his product, done something which the State had prohibited and had authority to prohibit. It had not prohibited the manufacture, and it had no authority to prohibit the foreign sales.

We concede what the court claims for the power of the State to suppress conspiracies, no matter against whom directed. We concede the power to suppress the publication of obscene literature, no matter where it is to be circulated. We concede the power to prohibit the manufacture of unwholesome foods, no matter upon whom they are to be imposed. These things are inherently and absolutely wrong. The common sense of mankind condemns them. Nothing can justify a toleration of them to any extent or for any purpose. But the power of a State to punish acts clearly criminal in themselves, when committed within its jurisdiction, does not include the power to prescribe the mode in which a useful commodity, the subject of lawful commerce, shall be dealt with in another State in relation to the domestic concerns of that State. The fault of the court's argument, its fundamental weakness, is that it does not distinguish between crime and commerce.

We admit the authority of the State of Iowa to punish crimes committed within its own borders, and we deny only

what only is here involved, its authority to regulate commerce with foreign nations and among the several States. The principles contended for by us have been recognized and upheld in a number of cases in Iowa arising under this very law. *Niles* v. *Fries*, 35 Iowa, 41; *Becker* v. *Betten*, 39 Iowa, 668.

It is claimed, however, that the State may absolutely prohibit the traffic in intoxicating liquors, and that it may, therefore, do anything which is less than such absolute prohibition. That is to say, the State may prohibit all commerce in alcohol, domestic and external; it may, therefore, prohibit any part of such commerce, either the domestic or the external.

We have no occasion to consider the claim of power to impose an absolute prohibition, because the consequence contended for by no means follows. There is no such thing as arbitrary power in our system of government. Every function possessed by the State was conferred by the people, to be exercised in their interest and for their welfare, and it is limited in its scope by the necessity for its exercise.

An absolute prohibition of the manufacture and sale of alcohol involves a finding by the legislature that alcohol is wholly bad, and incapable of any good uses whatsoever. Such a prohibition being imposed, and in such a view, it may be that no exception could be claimed against it. That question is not in the case, and so we need not discuss it.

A prohibition upon the manufacture and sale of alcohol only for certain uses, involves a legislative finding that so far as not prohibited alcohol is beneficial, and hurtful alone when applied to the prohibited uses. This legislative finding is conclusive until reversed, and is binding upon the legislature itself; and it cannot by sheer force of authority do aught that is inconsistent therewith. This finding indicates the limits of the legislative power over alcohol, because it indicates the extent to which alcohol is hurtful to the State. To prohibit its manufacture, sale, or use beyond the requirements of the public welfare, is arbitrary and absurd, quite as much so as would be a like prohibition against the growing of corn or other staple production of the State. What we are contending for was the very point of the decision in *Preston* v. *Drew*, 33 Maine, 558; *S. C.* 54 Am. Dec. 639.

We again invite comparison with the limitations upon the taxing power of the States. These were carefully considered in *McCulloch* v. *Maryland*, 4 Wheat. 316. Chief Justice Marshall there said:

"It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which government may choose to carry it. . . .

"The people of a State, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right. . . .

"It may be objected to this definition, that the power of taxation is not confined to the people and property of a State. It may be exercised upon every object brought within its jurisdiction. This is true. But to what source do we trace this right? It is obvious that it is an incident of sovereignty, and is co-extensive with that to which it is an incident." See also *Crandall* v. *Nevada*, 6 Wall. 35.

No more comprehensive scope than this has ever been assigned to the police power. The power to tax implies the power to destroy, as does the power to regulate the power to prohibit; but the State cannot be permitted to exercise these powers, or either of them, to the destruction of, or interference with interests confided exclusively to the care of the national authority. See also *Loan Association* v. *Topeka*, 20 Wall. 655; *Kansas* v. *Saunders*, 19 Kansas, 127.

It is claimed that even if alcohol may, after it is manufactured, be freely exported, nevertheless the manufacture for such exportation may be prohibited, because that is a purely domestic process, begun and completed within the State, and therefore subject to its authority.

That manufactures may *per se* be the subject of regulation, nobody denies. But the reason for such regulation wherever it has been attempted is obvious. There may be, incident to the process, noxious smells, and the generation of poisonous gases, as in the case of rendering and fertilizing establishments.

There may be danger of fire or explosion, as in the manufacture of burning fluids or explosive powders. In all these cases the provisions of the law are adapted to reducing the peculiar perils of the trade to a minimum.

The state court say that the evils flowing from intoxicating liquor arise wholly from its use as a beverage. As the law attempts not directly to inhibit that use, but indirectly by inhibiting the sale for such use, we may say that it is the sale alone which the law has in view. From that all the apprehended evils flow, and the sole reason for imposing any restrictions upon the manufacture is, that all manufacture is for purpose of sale, and carries with it the right of sale, and therefore a limitation is imposed upon it correspondent with that upon the sale. The commerce and the manufacture stand upon the same footing. Wherever commerce is lawful, manufacture to supply that commerce is also lawful.

From all the legislation of all the States, and from all the adjudication upon such legislation by the courts, we challenge the citation of another instance wherein the limitations upon the production of an article which might be hurtful in use, were broader than the limitations on the sale.

Under whatever class of regulations the manufacture may fall, conforming to them, it may be carried on to whatever extent the requirements of lawful commerce may justify, and any regulation in denial or limitation of that right, is a regulation, not of manufacture, but of commerce, and must be considered in that view.

Granting therefore that the State did intend a limitation upon the manufacture of alcohol, considered merely as an industrial process, it would have no authority to effect that limitation by a restriction to manufacture for domestic uses.

The object of all labor is to supply the wants of the laborer. In civilized society, however, labor alone cannot accomplish this object. There must be exchange of the products of labor. Commerce is industry. It is in every just sense a part of the purpose and process of production. The commodity must not only be made, but it must be brought to the consumer, and the cost of this is added to the price paid by the consumer for the

commodity. So, too, industry, save that limited amount of labor which in the very performance gratifies an ultimate want, is commerce. It is the prospect of exchange that incites to labor and determines its direction and extent. Commerce and industry are thus essential parts of one great plan. The ligament that binds them together is vital to each. What affects the one, affects the other. Nevertheless, regulations that go to the mere modes or processes of industry have but an incidental effect upon commerce, and the power to make them, in so many cases vitally essential to the welfare of their people, was not withdrawn from the States. But regulations that in terms limit the purposes for which and the markets in which the products of labor may be offered in exchange are commercial regulations, and it is a mere quibble to speak of them as anything else. *Railroad Co.* v. *Husen, supra; Philadelphia Steamship Co.* v. *Pennsylvania, supra; Almy* v. *California, supra; Woodruff* v. *Parham,* 8 Wall. 123; *Brown* v. *Maryland,* 12 Wheat. 419; *Welton* v. *Missouri, supra; Robbins* v. *Shelby County Taxing District, supra.*

These cases establish that a regulation of industry in its relation to commerce is a commercial regulation and is to be so considered, no matter by what indirection it is imposed. That the State is not restrained from making such regulations by the Fourteenth Article of Amendment may be true, but that is nothing to our present purpose, which is to determine the effect of the commercial clause.

The proposition must be maintained broadly that the State may by limitations imposed upon the commercial purposes for which production is carried on, effect the entire destruction of its external commerce, or the law here in question must be limited to its domestic traffic. We are concerned to know if a power exists and not whether it has been reasonably exercised. Authority is removed above the necessity of giving reasons and needs not even to resort to Falstaff's shift of declining to give them on compulsion.

Counsel also argued as a second point that the statute contravenes the Fourteenth Article of Amendment to the Constitution; but, as the opinion of the court treats this question as

settled, this portion of the argument is omitted. Indeed it has been necessary to curtail and condense the argument on the first point.

*Mr. C. C. Cole* and *Mr. John S. Runnells,* for defendants in error, submitted on their brief.

MR. JUSTICE LAMAR, having stated the case as above reported, delivered the opinion of the court.

The Supreme Court of Iowa, in its opinion, a copy of which, duly authenticated, is found in the record, having been transmitted according to our 8th Rule of Practice, held the sections in question to mean: (1) That foreign intoxicating liquors might be imported into the State, and there kept for sale by the importer, in the original packages (or for transportation in such packages and sale beyond the limits of the State); (2) That intoxicating liquors might be manufactured and sold within the State for mechanical, medicinal, culinary, and sacramental purposes, but for no other — not even for the purpose of transportation beyond the limits of the State; (3) That the statute thus construed raised no conflict with the Constitution of the United States, and was therefore valid.

As the record presents none of the exceptional conditions which sometimes impel this court to disregard inadmissible constructions given by State courts to even their own State statutes and State constitutions, we shall adopt the construction of the statute of Iowa under consideration, which has been given it by the Supreme Court of that State.

The questions then, for this court to determine are: (1) Does the statute as thus construed conflict with Section 8, Article 1, of the Constitution of the United States by undertaking to regulate commerce between the States; and (2) Does it conflict with the Fourteenth Amendment to that Constitution by depriving the owners of the distillery of their property therein without "due process of law." All of the assignments of error offered are but variant statements of one or the other of these two propositions.

The second of the propositions has been disposed of by this

court in the ease of *Mugler* v. *Kansas*, 123 U. S. 623, wherein this very question was raised upon a statute similar, in all essential respects, to the provisions of the Iowa code whose validity is contested. The court decided that a State has the right to prohibit or restrict the manufacture of intoxicating liquors within her limits; to prohibit all sale and traffic in them in said State; to inflict penalties for such manufacture and sale, and to provide regulations for the abatement as a common nuisance of the property used for such forbidden purposes; and that such legislation by a State is a clear exercise of her undisputed police power, which does not abridge the liberties or immunities of citizens of the United States, nor deprive any person of property without due process of law, nor in any way contravenes any provision of the Fourteenth Amendment to the Constitution of the United States. Upon the authority of that case and of the numerous cases cited in the opinion of the court, we concur in the decision of the Iowa courts that the provisions here in question are not in conflict with the said amendment. The only question before us, therefore, is as to the relation of the Iowa statutes to the regulation of commerce among the States.

The line which separates the province of federal authority, over the regulation of commerce, from the powers reserved to the States, has engaged the attention of this court in a great number and variety of cases. The decisions in these cases, though they do not in a single instance assume to trace that line throughout its entire extent, or to state any rule further than to locate the line in each particular case as it arises, have almost uniformly adhered to the fundamental principles which Chief Justice Marshall, in the case of *Gibbons* v. *Ogden*, 9 Wheat. 1, laid down as to the nature and extent of the grant of power to Congress on this subject, and also of the limitations, express and implied, which it imposes upon state legislation with regard to taxation, to the control of domestic commerce, and to all persons and things within its limits, of purely internal concern.

According to the theory of that great opinion, the supreme authority in this country is divided between the government

of the United States, whose action extends over the whole Union, but which possesses only certain powers enumerated in its written Constitution, and the separate governments of the several States, which retain all powers not delegated to the Union. The power expressly conferred upon Congress to 'regulate commerce is absolute and complete in itself, with no limitations other than are prescribed in the Constitution; is to a certain extent exclusively vested in Congress, so far free from state action; is co-extensive with the subject on which it acts, and cannot stop at the external boundary of a State, but must enter into the interior of every State whenever required by the interests of commerce with foreign nations, or among the several States. This power, however, does not comprehend the purely internal domestic commerce of a State which is carried on between man and man within a State or between different parts of the same State.

The distinction is stated in the following comprehensive language:

"The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself." p. 195.

Referring to certain laws of state legislatures which had a remote and considerable influence on commerce, the court said that the acknowledged power of the State to regulate its police, its domestic trade, and to govern its own people may enable it to legislate over this subject to a great extent; but these and other state laws of the same kind are not considered as an exercise of the power to regulate commerce with foreign nations and among the several States, or enacted with a view to it; but, on the contrary, are considered as flowing from the acknowledged power of a State to provide for the safety and welfare of its people, and form a part of that legislation which

embraces everything within the territory of a State not surrendered to the general government. Sacred, however, as these reserved powers are regarded, the court is particular to declare with emphasis the supreme and paramount authority of the Constitution and laws of the United States, relating to the regulation of commerce with foreign nations, and among the several States; and that whenever these reserved powers, or any of them, are so exercised as to come in conflict with the free course of the powers vested in Congress, the law of the State must yield to the supremacy of the Federal authority, though such law may have been enacted in the exercise of a power undelegated and indisputably reserved to the States.

In the light of these principles, and those which this court in its numerous decisions has added in illustration and more explicit development, it will not be difficult to determine whether the law of Iowa under consideration invades, either in purpose or effect, the domain of Federal authority.

To support the affirmative, the plaintiff in error maintains that alcohol is, in itself, a useful commodity, not necessarily noxious, and is a subject of property; that the very statute under consideration, by various provisions, and especially by those which permit, in express terms, the manufacture of intoxicating liquors for mechanical, medicinal, culinary, or sacramental purposes, recognizes those qualities, and expressly authorizes the manufacture; that the manufacture being thus legalized, alcohol not being *per se* a nuisance, but recognized as property and the subject of lawful commerce, the State had no power to prohibit the manufacture of it for foreign sales.

The main vice in this argument consists in the unqualified assumption that the statute legalizes the manufacture. The proposition that, supposing the goods were once lawfully called into existence, it would then be beyond the power of the State either to forbid or impede their exportation, may be conceded. Here, however, the very question underlying the case is whether the goods ever came lawfully into existence. It is a grave error to say that the statute "expressly authorized" the manufacture, for it did not; to say that it had not prohibited the manufacture, for it had done so; to say that the goods were

of Iowa's lawful manufactures, for that is substantially the very point at issue. The exact statute is this: "No person shall manufacture *or* sell, . . . directly or indirectly, any intoxicating liquors, except as hereinafter provided." In a subsequent section it is provided further, that "nothing contained in this law shall prevent any persons from manufacturing in this State liquors for the purpose of being sold according to the provisions of this chapter, to be used for mechanical, medicinal, culinary, or sacramental purposes." Here then is, first, a sweeping prohibition against, not the manufacture *and* sale; not a dealing which is composed of both steps, and consequently must include manufacture as well as sale, or, *e converso*, sale as well as manufacture, in order to incur the denunciation of the statute, but against either the sale *or* the manufacture. The conjunction is disjunctive. The sale is forbidden, the manufacture is forbidden; and each is forbidden independently of the other. Such being the case, on the subject of the lawfulness or unlawfulness of the *manufacture* (which is the point before the court), it is useless to argue as to the conditions under which it is permissible to hold intoxicating liquors in possession, or to sell them.

Looking again to the statute, we find that the unqualified prohibition of any and all manufacture made by § 1523 is by the joint operation of a proviso in § 1524 and of §§ 1526 and 1530, modified by four exceptions, viz.: Sale for mechanical purposes, to an extent limited by the wants of the particular locality of the seller; sale for medicinal purposes, to the same extent; sale for culinary purposes, to the same extent; and sale for sacramental purposes, to the same extent. The Supreme Court of the State held (and we agree with it) that these exceptions do not include sales outside of the State. The effect of the statute, then, is simply and clearly to prohibit all manufacture of intoxicating liquors except for one or more of the four purposes specified. "For the purpose," says the statute. The excepted purpose is all that saves it from being *ab initio* and, through each and every step of its progress, unlawful.

It is a mistake to say, as to this case, that the act of trans-

porting the alcohol from the State in the course of lawful commerce with other States not being a crime, to perform that act was not a criminal intent, no matter when formed, whether before or after the alcohol was manufactured. It is not the criminality of the intent to *export* that is here the question, but it is the innocence or criminality, under the statute of the *manufacture*, in the absence of all four of the specific exceptions to the prohibition, the actual and controlling and *bona fide* presence of at least one of which was indispensable to the legality of the manufacture.

We think the construction contended for by plaintiff in error would extend the words of the grant to Congress, in the Constitution, beyond their obvious import, and is inconsistent with its objects and scope. The language of the grant is, "Congress shall have power to regulate commerce with foreign nations and among the several States," etc. These words are used without any veiled or obscure signification. "As men whose intentions require no concealment generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense and to have intended what they have said." *Gibbons* v. *Ogden, supra*, at page 188.

No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation — the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. The legal definition of the term, as given by this court in *County of Mobile* v. *Kimball*, 102 U. S. 691, 702, is as follows: "Commerce with foreign countries, and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation, and the transportation and transit of persons and property,

as well as the purchase, sale, and exchange of commodities." If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining — in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest, and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the States, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform, and vital interests — interests which in their nature are and must be, local in all the details of their successful management.

It is not necessary to enlarge on, but only to suggest the impracticability of such a scheme, when we regard the multitudinous affairs involved, and the almost infinite variety of their minute details.

It was said by Chief Justice Marshall, that it is a matter of public history that the object of vesting in Congress the power to regulate commerce with foreign nations and among the several States was to insure uniformity of regulation against conflicting and discriminating state legislation. See also *County of Mobile* v. *Kimball, supra,* at page 697.

This being true, how can it further that object so to interpret the constitutional provision as to place upon Congress the obligation to exercise the supervisory powers just indicated? The demands of such a supervision would require, not uniform legislation generally applicable throughout the United States, but a swarm of statutes only locally applicable and utterly inconsistent. Any movement toward the establishment of rules of production in this vast country, with its many dif-

ferent climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. On the other hand, any movement toward the local, detailed, and incongruous legislation required by such interpretation would be about the widest possible departure from the declared object of the clause in question. Nor this alone. Even in the exercise of the power contended for, Congress would be confined to the regulation, not of certain branches of industry, however numerous, but to those instances in each and every branch where the producer contemplated an interstate market. These instances would be almost infinite, as we have seen; but still there would always remain the possibility, and often it would be the case, that the producer contemplated a domestic market. In that case the supervisory power must be executed by the State; and the interminable trouble would be presented, that whether the one power or the other should exercise the authority in question would be determined, not by any general or intelligible rule, but by the secret and changeable intention of the producer in each and every act of production. A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the States, and less likely to have been what the framers of the constitution intended, it would be difficult to imagine.

We find no provisions in any of the sections of the statute under consideration, the object and purpose of which are to exert the jurisdiction of the State over persons or property or transactions within the limits of other States; or to act upon intoxicating liquors *as* exports, or while they are in process of exportation or importation. Its avowed object is to prevent, not the carrying of intoxicating liquors *out* of the State, but to prevent their manufacture, except for specified purposes, *within* the State. It is true that, notwithstanding its purposes and ends are restricted to the jurisdictional limits of the State of Iowa, and apply to transactions wholly internal and between its own citizens, its effects may reach beyond the State by lessening the amount of intoxicating liquors exported. But it does not follow that, because the products of a domestic

manufacture may ultimately become the subjects of interstate commerce, at the pleasure of the manufacturer, the legislation of the State respecting such manufacture is an attempted exercise of the power to regulate commerce exclusively conferred upon Congress. Can it be said that a refusal of a State to allow articles to be manufactured within her borders (for export) any more directly or materially affects her external commerce than does her action in forbidding the retail within her borders of the same articles after they have left the hands of the importers? That the latter could be done was decided years ago; and we think there is no practical difference in principle between the two cases.

"As has been often said, 'legislation [by a State] may in a great variety of ways affect commerce and persons engaged in it, without constituting a regulation of it within the meaning of the Constitution,'" unless, under the guise of police regulations, it "imposes a direct burden upon interstate commerce," or "interferes directly with its freedom." *Hall* v. *De Cuir*, 95 U. S. 485, 487, 488, Chief Justice Waite delivering the opinion of the court in that case, citing *Sherlock* v. *Alling*, 93 U. S. 99, 103 ; *State Tax on Railway Gross Receipts*, 15 Wall. 284 ; *Munn* v. *Illinois*, 94 U. S. 113 ; *Chicago, Burlington and Quincy Railroad Co.* v. *Iowa*, 94 U. S. 155 ; *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245 ; *Pound* v. *Turck*, 95 U. S. 459 ; *Gilman* v. *Philadelphia*, 3 Wall. 713 ; *Gibbons* v. *Ogden, supra ;* and *Cooley* v. *Board of Wardens, etc.*, 12 How. 299.

We have seen that whether a State, in the exercise of its undisputed power of local administration, can enact a statute prohibiting within its limits the manufacture of intoxicating liquors, except for certain purposes, is not any longer an open question before this court. Is that right to be overthrown by the fact that the manufacturer *intends* to export the liquors when made? Does the statute, in omitting to except from its operation the manufacture of intoxicating liquors within the limits of the State for export, constitute an unauthorized interference with the power given to Congress to regulate commerce?

These questions are well answered in the language of the

court in the *License Tax Cases*, 5 Wall. 462, 470 : "Over this commerce and trade [the internal commerce and domestic trade of the States] Congress has no power of regulation, nor any direct control. This power belongs exclusively to the States. No interference by Congress with the business of citizens transacted within a State is warranted by the Constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature. The power to authorize a business within a State is plainly repugnant to the exclusive power of the State over the same subject." The manufacture of intoxicating liquors in a State is none the less a business within that State, because the manufacturer intends, at his convenience, to export such liquors to foreign countries or to other States.

This court has already decided that the fact that an article was manufactured for export to another State does not *of itself* make it an article of interstate commerce within the meaning of § 8, Art. 1, of the Constitution, and that the intent of the manufacturer does not determine the time when the article or product passes from the control of the State and belongs to commerce.

We refer to the case of *Coe* v. *Errol*, 116 U. S. 517. In that case certain logs cut at a place in New Hampshire had been hauled to the town of Errol on the Androscoggin River, in that State, for the purpose of transportation beyond the limits of that State to Lewiston, Maine; and were held at Errol for a convenient opportunity for such transportation. The selectmen of the town assessed on the logs State, county, town, and school taxes; and the question before the court was whether these logs were liable to be taxed like other property in the State of New Hampshire. The court held them to be so liable, and said, Mr. Justice Bradley delivering the opinion : "Does the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation? This is the precise question for solution. . . . There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of

commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the State of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepôt for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State. Until then it is reasonable to regard them as not only within the State of their origin, but as a part of the general mass of property of that State, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without any discrimination, in the usual way and manner in which such property is taxed in the State. . . . The point of time when State jurisdiction over the commodities of commerce begins and ends in not an easy matter to designate or define, and yet it is highly important, ooth to the shipper and to the State, that it should be clearly defined so as to avoid all ambiguity or question. . . . But no definite rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State. What we have already said, however, in relation to the products of a State intended for exportation to another State, will indicate the view which seems to us the sound one on that subject, namely, that such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey. . . . It is true, it was said in the case of *The Daniel Ball*, 10 Wall. 557, 565 : 'Whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced.'.

But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other."

The application of the principles above announced to the case under consideration leads to a conclusion against the contention of the plaintiff in error. The police power of a State is as broad and plenary as its taxing power; and property within the State is subject to the operations of the former so long as it is within the regulating restrictions of the latter.

The judgment of the Supreme Court of Iowa is

*Affirmed.*

MR. CHIEF JUSTICE FULLER was not a member of the court when this case was argued and submitted, and took no part in its decision.