UNITED STATES v. WHITTENBERG
et al.
No. 343.

District Court, S. D. Texas, Brownsville
Division.
Jan. 8, 1938.

Douglas W. McGregor, U. S. Atty., of Houston, Tex., J. L. Abney, Asst. U. S. Atty., of Brownsville, Tex., John S. L. Yost, Asst. to Atty. Gen., and G. Osmond Hyde, Atty., Department of Agriculture, of Washington, D. C., for the United States.

A. W. Cameron, of Edinburg, Tex., and Sid Hardin, of Edinburg, Tex., for respondents.

ATWELL, District Judge.

On December 15, 1937, the United States filed its bill against the respondents alleging the violation of orders made in pursuance of the Agricultural Marketing Agreement Act of June 3, 1937, 50 Stat. 246. Many shipments out of the state are shown from early in October, 1937, up to and including the last days of November. There is a detailed itemization of the consignees, the number of boxes, which total many thousands, the date, and the carrier. Allegations are made specifically showing compliance with the 1937 act and setting out the pertinent portions of the order made under such act, by the Secretary, for the counties of Cameron, Hidalgo, and Willacy, Texas, which is the area in Texas created as including the citrus producing territory of that state. The act provides for creation of such areas, since citrus fruit is confined to approximately four sections of the nation, to wit, California, Arizona, the Rio Grande Valley of Texas, and Florida.

Temporary, interlocutory and permanent injunctions are sought.

The respondents answered fully, but later, by stipulation, and in furtherance of the desire of all concerned parties to speed the cause, they withdrew all portions thereof except paragraphs 17, 18, 19, and 20. Those paragraphs challenge the constitutionality of the act, the agreement made in pursuance thereof, the order thereunder, and all regulations emanating from such sources. They claim that the act is violative of the Tenth Amendment, since it invades the reserved rights of the states and is a statutory plan to regulate and control agricultural production and prices,

which is beyond the powers delegated to the national government. That it is violative of article 1, section 1, in that it is an attempt to delegate legislative powers to the Secretary of Agriculture, who is an administrative officer. That sections 8b and 8c of the act, 7 U.S.C.A. §§ 608b, 608c, and the Marketing Agreement promulgated thereunder, are void because they delegate legislative powers to the Secretary of Agriculture. That section 8c is void because it delegates legislative power to the handlers of 50 per cent. of the volume of fruit to be affected by the agreement and order. That the same sections are violative of the Fifth Amendment in that the immediate effect thereof is to deprive them of their property without due process, in that the Secretary of Agriculture, who is a party to the marketing agreement, is authorized to become judge and jury to pass upon the validity of the same agreement, regulations, and orders. Further, that the provisions thereof authorize the Secretary of Agriculture to limit and restrict the respondents in their right to lawfully use and dispose of their property, and to limit and restrict the respondents in the disposition of their property upon findings made by the Secretary without the right of jury trial. That it prohibits to them the lawful use and disposition of their property. . It discriminates against the handlers and producers who have and own and wholesale an edible fruit of certain sizes and appearances in favor of other handlers and producers who have and own fruit of other sizes and appearances.

Under the stipulation the case went to trial for final decree. At that trial some twenty comprehensive affidavits were presented as depositions. They showed that there were 65,000 growers of grapefruit and oranges in the United States of which 6,600 are in Texas. During the 1936–37 season 18,000,000 boxes of grapefruit and 43,000,-000 boxes of oranges were shipped from citrus producing states to the consumers in the United States, Canada, and foreign countries. Of these, 6,600,000 boxes, or 37 per cent. of the grapefruit shipments, and 1,800,000 boxes, or 4 per cent. of all orange shipments, originated in Texas. The estimate of farm value of all oranges and grapefruit produced in the United States during the season amounted to $92,-653,000, of which Texas contributed $7,285,-000 from grapefruit, and $2,400,000 from oranges. Citrus culture is one of the principal agricultural enterprises in the lower Rio Grande Valley of Texas which extends over the three counties mentioned. Thirty-one per cent. of the total acreage in cotton, fruit, and vegetable crops in this territory is devoted to oranges and grapefruit. Approximately 78,400 acres in Hidalgo, 28,100 acres in Cameron, and 2,700 acres in Willacy, or a total of 109,000 acres, are planted to orange and grapefruit trees. That citrus fruit is grown on more than half of the farms in Hidalgo county, one-third of the farms in Cameron, and one-fifth of the farms in Willacy. When an area directs so large a proportion of its productive capacity to one industry the economic prosperity of that area naturally fluctuates with the vicissitudes of the returns from the sale of that product, and the purchasing power of such growers depends principally upon returns from sales of citrus fruit which enter the channels, of interstate trade and commerce, and such returns are of primary importance to them.

Pursuant to section 8c of the Marketing Act, the years 1924–25 to 1928–29 were established as the base period for Texas citrus fruit. Order 15 of the Secretary of Agriculture, approved June 3, 1937.

In no season since the base period has the farm price for Texas oranges and grapefruit had a purchasing power equivalent to that which obtained in the base period, at which time the farm price averaged $2.10 a box for grapefruit and $2.09 a box for oranges. During the 1936–37 season grapefruit farm prices averaged less than 40 per cent. of parity, and farm prices of oranges averaged 93 per cent. Preliminary calculations for the 1937–38 season indicates a parity price of $1.76 for oranges and $1.77 for grapefruit.

The shipments from Cameron, Hidalgo, and Willacy counties are primarily interstate in character. Approximately 84 per cent. of the grapefruit shipped from these counties during 1936–37 was shipped to points outside of the state and distributed to consumers in forty-two states, plus the District of Columbia and Canada. This section of Texas supplies virtually all of the grapefruit consumed west of the Mississippi river with the exception of the Pacific Coast states. In the 1936–37 season, 63 per cent. of the Texas orange shipments were marketed in trade channels outside of Texas and were distributed in twenty-six states and Canada, while the market for Texas oranges is concentrated to adjacent and nearby states. Figures were presented

showing a growth in both production and shipments for oranges and grapefruit.

Considerable instability in the movement of prices from week to week within any one season was shown as being due, in a large measure, to the volume and timing of shipments, and that a measure of stability can be secured by an adjustment of the quantity shipped to market. Such control must come from concentrated effort toward the regulation of the flow of shipments in interstate commerce and by the control of grade and size. Control of this sort is committed to the Secretary under the act. A poor quality which is undesirable for fresh consumption has a tendency to destroy confidence of customers and affects the market, and the elimination of cull fruit is of benefit. The State of Texas has certain maturity standards, which fruit must pass, in order to be shipped and that the regulations of the Secretary maintain quality and standards in harmony with the Texas requirements. There is considerable independence in the demand for each size of grapefruit and that an increase in the volume of shipments of any given size will depress the price received for that size relative to the price of other sizes. That during large crop years and general low prices, sizes, of which there is a large quantity on the market, fall to prices that are only equal to, or below total handling charges and the grower receives nothing for his crop and sometimes even suffers a loss in getting his fruit to market.

The factors considered in the orders are: Current market prices, fruit on hand in market areas, supplies of competing areas which produce citrus fruit, other competitive fruits, trend in consumer income, and available supply and condition of fruit in the producing areas.

Full participation in affecting an orderly movement market is necessary. All handlers should obey the orders in order to insure equitable benefit and a sharing of the burden.

The testimony established complete compliance with the provisions of the act in the reception of demand for the order, necessary meetings, notices, committees, etc.

The Growers Industry Committee is composed of twelve members and the Shippers Marketing Committee has seven members. These committees are the choice of the local people and are ratified by the Secretary.

Sizes of grapefruit are those which have less than 96 to the box, 96, 112, 126, and 150 per box; these boxes contain 1⅗ bushels, and all including and over 96 are small sizes. United States grade Nos. 1 and 2 and preferable, while grade No. 3 are culls. These grades depend, not upon size, but upon shape, color texture, scale, etc. The small size may be good grade, that is, the first or second.

The testimony also showed that during the present year the sizes are smaller than usual, and that there is a good demand for such sizes outside of Texas and in Canada. That the respondents, as well as others for that matter, frequently bought fruit in the field which, of course, included all sizes and grades, and that under the regulations and order of the Secretary shipments of smaller sizes were largely prohibited and for that reason great loss is suffered by such producers and growers. Sometimes as much as twenty to twenty-five dollars per ton was paid, which, in turn, netted the purchasers and growers as low as eight and ten dollars per ton, and in some instances no shipments could be made at all, due to the Marketing Act agreement. That prices are lower this year due to this regulation.

One of the government experts claimed that the early sale of small sizes prevented the necessary sale of large sizes and the ultimate filling out of the small sizes in the later months of the season so that they themselves would become larger sizes.

There are two groups of shippers, one of which is known as the Independents and the other as the Co-operatives. Some members of the Co-operatives sell for cash to the independents. Those who belong to the Co-operatives turn their fruit in to that organization and later receive the returns as they mature, while if a sale is made to the Independents cash comes at once and the Independent shipper must bear the burden of losses, or have the benefit of increase in price, as the case may be.

The testimony goes into considerable detail from the angle of each party to this case, but the review that I have given evidences the scope and importance of the controversy. It should be added that the respondents claim much unfairness and favoritism results from the marketing system, while the testimony of the complainant shows that the same is a reasonable, practicable, and undiscriminating plan.

■ It is difficult for the careful thinker to view the legislation as a clear interstate commerce regulation. It has the complection of a clever control over the product of the orchard in order to establish prices. In the "declaration of policy" there is an attempt to link the price, which agricultural commodities bring, with the flow of commodities in interstate commerce, by declaring that there is a disruption of the orderly exchange of such commodities when the purchasing power of the farm is decreased. But one may not certainly challenge a declaration because there may be an insufficient clearness in the syllogism. True it must be that the stream of interstate commerce will fluctuate in response to the floods, or ebbs of agriculture. Production, and purchase, and sales, and shipments, are all interrelated and it may be that the ultimate effect is properly left to the legislating power.

Many of the rough edges of prior efforts in this direction have been smoothed, and many of the faults have been remedied, so that this act has the virtue of local birth, local management, local hearings, local notices, voluntary participation, and a diagraming of the substance of what may then be decreed by the Secretary of Agriculture.

Section 8b, 7 U.S.C.A. § 608b, authorizes these agreements, "Only with respect to such handling as is in the current of interstate or foreign commerce."

Section 8c, 7 U.S.C.A. § 608c, again limits the orders to such product, "As is in the current of interstate or foreign commerce."

Subdivision (3) of section 8c, 7 U.S.C.A. § 608c(3), provides for notice to appear for hearing upon a proposed order.

Subdivision (4) of the same section, 7 U.S.C.A. § 608c(4), provides that the Secretary "shall issue an order." There is no option about it.

Subdivision (6) of the same section, 7 U.S.C.A. § 608c(6), provides the terms and conditions of the order, to wit, "for the limitation of, the total quantity * * * or of any grade, size or quality * * * which may be marketed in or transported to any or all markets in the current of interstate or foreign commerce."

Paragraph (C) of subdivision (6) of section 8c, 7 U.S.C.A. § 608c(6) (C), relates to allotments, "to any or all markets in the current of interstate or foreign commerce."

Subdivision (7) of section 8c, 7 U.S.C.A. § 608c(7), provides the terms that must enter into all orders.

Subdivision (8) of the same section, 7 U.S.C.A. § 608c(8), gives the requisites of the agreement and provides for the percentages of the citizens who must consent. Neither the retailer nor the producer are affected by the act. A handler who is subject to an order may file a petition praying for a modification, or for exemption and he shall be given a hearing, and a United States District Court may review the finding of the Secretary.

Finally, there are provisions for the termination, for the keeping of books and records, and the determination of the base period.

This rather rough review of the act evidences a number of guaranties to the citizen that seem to save the legislation from a great deal of criticism leveled against it. It must be conceded that efforts of this sort for the conservation and preservation of markets by and through the legal right to control interstate commerce must result in harm or hurt to some. The good that results to the majority is thought to be the virtue that saves the legislation from condemnation.

■ A power that is vested in the Congress, by the Constitution, may be exercised in such manner as the congress may find to be appropriate. This does not mean that the judiciary is to close its eyes to a senseless or unsupported, or unreasonable, or arbitrary, exercise of purported power. Nor does it mean that a pretense to act under a power will support legislation quite out of harmony with the power delegated.

A criminal is just as dangerous to the nation in Texas, before he crosses the state line into Oklahoma, as he is after he crosses that line, but the Congress has thought that his passing into interstate commerce gives it sufficient basis to support a criminal charge against him for so doing. Perhaps, more easily supported, is legislation against grain exchanges and stockyards, and the distribution of coal.

It may seem silly to prevent the shipment of a small orange or a small grapefruit, of good quality, and allow the shipment of large oranges and large grapefruit, of no better quality.

Oranges that are "runty,"
Grapefruit that are small,
Must wait a little longer
And may not travel at all.

We may not relish the trend of legislation. We may fear an erosion of the bases of our liberty, but such thoughts are political rather than judicial, and if our fears are well founded the remedy must be found elsewhere than in court.

Laws, stringent laws, punishing the smoker of a pebble of opium, or the one who takes a shot of narcotics, which offenses seem to be local, are based on the revenue rights of the national government. The transportation of a woman from one state to another for immoral purposes has been sustained under the commerce clause of the Constitution.

■ The due process suggestions are a little more troublesome. The only answer that can be made is that the act provides for hearings and the review thereof by a court. Small sizes may not be shipped in interstate commerce but they are not confiscated; intrastate markets are still open. The charge that the Congress has been remiss in its duty to do its own legislating and has committed that highly important function to the Secretary of Agriculture, and to the committees provided for, may be somewhat softened by the consideration of the provisions of the act itself which minutely diagrams what both the Secretary and the committees must find before there can be a prohibitive agreement. There are many illustrations of the sustaining of such delegations. One cannot say that they are the approved methods of legislating which are supposed to be followed in a republican form of government. Referendum, the voice of the people, and all popular movements are supposed to be echoed into and through laws passed by the regular lawmaking body. The criticism that the national government is invading the power of the states is somewhat less serious because it happens that Texas is, at the moment, supporting a statute and regulations with reference to intrastate fruit production and marketing in harmony with the national act.

Finally, it must be remembered that the respondents admit the large shipments in interstate commerce of the size and quality complained of and not permitted by this act and the order thereunder.

Decisions, with which we are all familiar, which exemplify questions discussed here, are: United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914; Rickert Rice Mills v. Frontenot, 297 U.S. 110, 56 S.Ct. 374, 80 L.Ed. 513; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L. Ed. 1570, 97 A.L.R. 947; Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160; Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385; Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346; Heisler v. Thomas Colliery Co., 260 U.S. 245, 43 S. Ct. 83, 67 L.Ed. 237; Baldwin v. G. A. F. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A.L.R. 55; Dahnke-Walter Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239; Lemke v. Farmers Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458; Shafer v. Farmers' Grain Co., 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909; Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835; Burco, Inc., v. Whitworth, 4 Cir., 81 F.2d 721; Edwards v. U. S., 9 Cir., 91 F.2d 767; U. S. v. David Buttrick Co., 1 Cir., 91 F.2d 66 (these last two are circuit court of appeals decisions upholding this act); Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724; Railroad Retirement Board v. Alton R. R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468; Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182; Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Pennsylvania R. R. Co. v. Clark Bros. Coal Mining Co., 238 U.S. 456, 35 S.Ct. 896, 59 L.Ed. 1406; Spalding & Bros. v. Edwards, 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed. 865; Flanagan v. Federal Coal Co., 267 U.S. 222, 45 S.Ct. 233, 69 L.Ed. 583; Federal Trade Comm. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Weber v. Freed, 239 U.S. 325, 36 S.Ct. 131, 60 L.Ed. 308, Ann.Cas.1916C, 317; Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A.,N.S., 906, Ann.Cas.1913E, 905; Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas. 1917B, 1168; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364; McDermott v. Wisconsin, 228 U.S. 115, 33 S.Ct. 431, 57 L.Ed. 754, 47 L.R.A.,N.S.,

718

984, Ann.Cas.1915A, 39; Weeks v United States, 245 U.S. 618, 38 S.Ct. 219, 62 L. Ed. 513; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; Brolan v. United States, 236 U.S. 216, 35 S.Ct. 285, 59 L.Ed. 544; Oregon-Washington R. & Nav. Co. v. Washington, 270 U.S. 87, 46 S.Ct. 279, 70 L.Ed. 482; Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013; United States v. Delaware & Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836; Elgin J. & E. Ry. Co. v. United States, 249 U.S. 601, 39 S.Ct. 259, 63 L.Ed. 797; Central Vermont Transportation Co. v. Durning, 294 U.S. 33, 55 S.Ct. 306, 79 L.Ed. 741; Whitfield v. Ohio, 297 U.S. 431, 56 S.Ct. 532, 80 L.Ed. 778; Kentucky Whip & Collar Co. v. Illinois Central R. R., 299 U.S. 334, 344, 57 S.Ct. 277, 279, 81 L.Ed. 270; Griswold v. President, 5 Cir., 82 F.2d 922; Public Utilities Comm. v. Attleboro Steam & Electric Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549; Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859; Van Camp & Sons v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311, 60 A.L.R. 1060; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; Acker v. U. S., 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Hegeman Farms Corp. v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259; Texas & New Orleans R. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034; Assigned Car Cases, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204; Champlin Refining Co. v. Corporation Comm. of Oklahoma, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Puget Sound Power & Light Co. v. Seattle, 291 U.S. 619, 54 S.Ct. 542, 78 L.Ed. 1025; Hampton, Jr. & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; New York Central Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138; Cusack Co. v. Chicago, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472, L.R.A.1918A, 136, Ann.Cas. 1917C, 59; Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed.

369; Pure Oil Co. v. State of Minnesota, 248 U.S. 158, 39 S.Ct. 35, 63 L.Ed. 180.

A percentage in excess of 50 per cent. of the Texas citrus growers requested these agreements. Public hearings were had at which growers and shippers were permitted to testify. Before the agreements became effective two-thirds of the growers and 50 per cent. of the shippers approved them. Committees meet each week and every recommendation that they make must be justified by the facts. The growers' committee is the administrator of the program and the shippers' committee is the advisory body. The idea is that the use of current interstate commerce may not be made by shippers with shipments, which do not come within the regulations as to grades and sizes, and, thus not permitting the smaller sizes to become larger, and the consumer to have edible fruit. Proration has not, as yet, been ordered, since the shippers are voluntarily reducing their shipments as suggested by the committees. It may present some different problems. At any rate this opinion is not to be used as an argument therefor.

Obeying such lights as a trial court has in the hurried presentment and consideration of a case so important, and bearing in mind the presumption in favor of constitutionality, I am of the opinion that restraint should issue as prayed and it is so directed.