## BUTLER et al. v. UNITED STATES. *

### No. 3018.

Circuit Court of Appeals, First Circuit.
July 13, 1935.

BINGHAM, Circuit Judge, dissenting.

*Writ of certiorari granted 56 S. Ct. 144, 80 L. Ed. ——.

Edward R. Hale and Bennett Sanderson, both of Boston, Mass., for appellants.

Robert N. Anderson, Sp. Asst. to Atty. Gen., and Prew Savoy, Department of Agriculture, of Washington, D. C. (Frank J. Wideman, Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., Seth Thomas, Department of Agriculture, of Washington, D. C., and Francis J. W. Ford, U. S. Atty., and J. Duke Smith, Sp. Asst. to U. S. Atty., both of Boston, Mass., on the brief), for the United States.

Malcolm Donald, of Boston, Mass. (Edward E. Elder and Herrick, Smith, Donald & Farley, all of Boston, Mass., of counsel), amici curiæ.

Charles B. Rugg, Thomas N. Perkins, and Ropes, Gray, Boyden & Perkins, all of Boston, Mass., amici curiæ.

James S. Y. Ivins, of Washington, D. C. (Brewster, Ivins & Phillips, of Washington, D. C., of counsel), amici curiæ.

Before BINGHAM and WILSON, Circuit Judges, and MORRIS, District Judge.

WILSON, Circuit Judge.

This is an appeal from a decree of the District Court of Massachusetts in the conduct of receivership proceedings against the Hoosac Mills Corporation, a Massachusetts corporation. The United States filed a claim with the receivers for processing and floor taxes levied under sections 9 and 16 of the Agricultural Adjustment Act, chapter 25, tit. 1, 48 Stat. 31, as amended, 7 USCA §§ 609, 616 (hereinafter referred to as the act), amounting in the aggregate to $81,694.28, of which $44,057.64 represented processing taxes and interest and $37,636.64 represented floor taxes and interest.

The receivers in their report to the District Court recommended that the claims for these taxes be disallowed. The District Court, however, found that the claims were valid, and entered a decree ordering the claims to be paid.

The receivers appealed from the decree and filed numerous assignments of error, which may be grouped under three heads:

(1) The taxes imposed are not warranted under the Federal Constitution, in that they were imposed for the unlawful purpose of regulating and restricting the production of cotton in the several states, which is an unwarranted interference with matters solely within the control of the respective states and is violative of the powers reserved to the states under the Tenth Amendment, and therefore does not constitute an exercise of any authority or power of taxation granted to Congress under section 8 of article 1 of the Constitution.

(2) The delegation of the power under sections 8 and 9 of the act (7 USCA §§ 608, 609) to the Secretary of Agriculture to determine by agreement with the producers which of the basic commodities enumerated under section 11 of the act, as amended (7 USCA § 611), shall be restricted as to production, to what extent the acreage devoted to the production of any of such basic commodities shall be limited to bring about the result sought to be gained by the act, to determine when rental or benefit payments shall be made and the amount, and the investing of power in the Secretary to determine when and what competing commodities should be taxed and to what extent, and to determine when such processing tax shall become effective or shall cease to be imposed, is an unwarranted delegation of the legislative power granted exclusively to Congress.

(3) That the processing and floor taxes imposed are direct taxes and are not apportioned as required under section 8 of article 1 of the Constitution, or, if excise taxes, are not uniform throughout the United States, and are therefore not authorized under the Constitution.

We are not unmindful of the rule of construction that a presumption exists as to the validity of an act of Congress, or that, if an act is susceptible of two interpretations, that should be accepted which will uphold its validity. It is clearly apparent, however, from the provisions of the act, that the main purpose of Congress in its enactment was not to raise revenue, but to control and regulate the production of what is termed the basic products of agriculture, in order to establish and maintain a balance between the production and consumption of such commodities, which Congress realized could not in any event be accomplished by compulsory regulation of the production of agricultural products, and it sought to avoid the objection that it was interfering with

matters solely within the control of the states themselves by making the restriction of production voluntary, by basing the act on the power of Congress to regulate interstate commerce, on its power to tax to provide for the general welfare of the United States, and by declaring that, in the acute economic emergency that exists, transactions in agricultural commodities have become affected with a public interest.

Title 1 of the act (section 1 [7 USCA § 601]) opens with the following:

"Declaration of emergency

"The present acute economic emergency being in part the consequence of a severe and increasing disparity between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities, and has seriously impaired the agricultural assets supporting the national credit structure, it is hereby declared that these conditions in the basic industry of agriculture have affected transactions in agricultural commodities with a national public interest, have burdened and obstructed the normal currents of commerce in such commodities, and render imperative the immediate enactment of title I of this Act [this chapter]."

According to recent pronouncements of the Supreme Court, however, such a declaration grants no new powers to Congress, nor does a declaration by Congress that, under certain conditions, the industry of agriculture is affected with a public interest or burdens and obstructs the normal flow of commerce necessarily give to Congress the absolute power to control or regulate it by legislation.

The assignments of error are based on the provisions of the following sections:

"Sec. 2. It is hereby declared to be the policy of Congress—

"(1) To establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period. The base period in the case of all agricultural commodities except tobacco shall be the prewar period, August 1909—July 1914. In the case of tobacco, the base period shall be the postwar period, August 1919—July 1929.

"(2) To approach such equality of purchasing power by gradual correction of the present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic and foreign markets.

"(3) To protect the consumers' interest by readjusting farm production at such level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the prewar period, August 1909—July 1914." 7 USCA § 602.

"Sec. 8. In order to effectuate the declared policy, the Secretary of Agriculture shall have power—

"(1) To provide for reduction in the acreage or reduction in the production for market, or both, of any basic agricultural commodity, through agreements with producers or by other voluntary methods, and to provide for rental or benefit payments in connection therewith or upon that part of the production of any basic agricultural commodity required for domestic consumption, in such amounts as the Secretary deems fair and reasonable, to be paid out of any moneys available for such payments. * * * Under regulations of the Secretary of Agriculture requiring adequate facilities for the storage of any non-perishable agricultural commodity on the farm, inspection and measurement of any such commodity so stored, and the locking and sealing thereof, and such other regulations as may be prescribed by the Secretary of Agriculture for the protection of such commodity and for the marketing thereof, a reasonable percentage of any benefit payment may be advanced on any such commodity so stored. In any such case, such deduction may be made from the amount of the benefit payment as the Secretary of Agriculture determines will reasonably compensate for the cost of inspection and sealing, but no deduction may be made for interest." 7 USCA § 608 (1).

"Sec. 9. (a) To obtain revenue for extraordinary expenses incurred by reason of the national economic emergency, there shall be levied processing taxes as hereinafter provided. When the Secretary of Agriculture determines that rental or benefit payments are to be made with respect to any basic agricultural commod-

ity, he shall proclaim such determination, and a processing tax shall be in effect with respect to such commodity from the beginning of the marketing year therefor next following the date of such proclamation. * * * The processing tax shall be. levied, assessed, and collected upon the first domestic processing of the commodity, whether of domestic production or imported, and shall be paid by the processor. The rate of tax shall conform to the requirements of subsection (b). Such rate shall be determined by the Secretary of Agriculture as of the date the tax first takes effect, and the rate so. determined shall, at such intervals as the Secretary finds necessary to effectuate the declared policy, be adjusted by him to conform to such requirements. The processing tax shall terminate at the end of the marketing year current at the time the Secretary proclaims that rental or benefit payments are to be discontinued with respect to such commodity. The marketing year for each commodity shall be ascertained and prescribed by regulations of the Secretary of Agriculture: Provided, That upon any article upon which a manufacturers' sales tax is levied under the authority of the Revenue Act of 1932 [chapter 20 of Title 26] and which manufacturers' sales tax is computed on the basis of weight, such manufacturers' sales tax shall be computed on the basis of the weight of said finished article less the weight of the processed cotton contained therein on which a processing tax has been paid.

"(b) The processing tax shall be at such rate as equals the difference between the current average farm price for the commodity and the fair exchange value of the commodity; except that if the Secretary has reason to believe that the tax at such rate * * * will cause such reduction in the quantity of the commodity or products thereof domestically consumed as to result in the accumulation of surplus stocks of the commodity or products thereof or in the depression of the farm price of the commodity, then he shall cause an appropriate investigation to ·be made and afford due notice and opportunity for hearing to interested parties. If thereupon the Secretary finds that any such result will occur, then the processing tax * * * shall be at such rate as will prevent such accumulation of surplus stocks and. depression of the farm price of the commodity. In comput-

ing the current average farm price in the case of wheat, premiums paid producers for protein content shall not be taken into account. * * *

"(c) For the purposes of part 2 of this title [sections 608 to 619 of this chapter], the fair exchange value of a commodity shall be the price therefor that will give the commodity the same purchasing power, with respect to articles farmers buy, as such commodity had during the base period specified in section 2 [section 602]; and the current average farm price and the fair exchange value shall be ascertained by the Secretary of Agriculture from available statistics of the Department of Agriculture." 7 USCA § 609 (a–c).

"Sec. 10. (c) The Secretary of Agriculture is authorized, with the approval of the President, to make such regulations with the force and effect of law as may be necessary to carry out the powers vested in him by this title [chapter], including regulations establishing conversion factors for any commodity and article processed therefrom to determine the amount of tax imposed or refunds to be made with respect thereto. Any violation of any regulation shall be subject to such penalty, not in excess of $100, as may be provided therein." 7 USCA § 610 (c).

As originally enacted (48 Stat. 38), section 11 read as follows:

"Sec. 11. As used in this title, the term 'basic agricultural commodity' means wheat, cotton, field corn, hogs, rice, tobacco, and milk and its products, and any regional or market classification, type, or grade thereof; but the Secretary of Agriculture shall exclude from the operation of the provisions of this title, during any period, any such commodity or classification, type, or grade thereof if he finds, upon investigation at any time and after due notice and opportunity for hearing to interested parties, that the conditions of production, marketing, and consumption are such that during such period this title can not be effectively administered to the end of effectuating the declared policy with respect to such commodity or classification, type, or grade thereof."

"Sec. 12. (a) There is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000,000 to be available to the Sec-

retary of Agriculture for administrative expenses under this title [chapter] and for rental and benefit payments made with respect to reduction in acreage or reduction in production for market under part 2 of this title [sections 608 to 619 of this chapter]. Such sum shall remain available until expended.

"(b) In addition to the foregoing, the proceeds derived from all taxes imposed under this title [chapter] are hereby appropriated to be available to the Secretary of Agriculture for expansion of markets and removal of surplus agricultural products and the following purposes under part 2 of this title [sections 608 to 619 of this chapter]: Administrative expenses, rental and benefit payments, and refunds on taxes. The Secretary of Agriculture and the Secretary of the Treasury shall jointly estimate from time to time the amounts, in addition to any money available under subsection (a), currently required for such purposes; and the Secretary of the Treasury shall, out of any money in the Treasury not otherwise appropriated, advance to the Secretary of Agriculture the amounts so estimated. The amount of any such advance shall be deducted from such tax proceeds as shall subsequently become available under this subsection." 7 USCA § 612 (a, b).

"Sec. 15. (a) If the Secretary of Agriculture finds, upon investigation at any time and after due notice and opportunity for hearing to interested parties, that any class of products of any commodity is of such low value compared with the quantity of the commodity used for their manufacture that the imposition of the processing tax would prevent in whole or in large part the use of the commodity in the manufacture of such products and thereby substantially reduce consumption and increase the surplus of the commodity, then the Secretary of Agriculture shall so certify to the Secretary of the Treasury, and the Secretary of the Treasury shall abate or refund any processing tax assessed or paid after the date of such certification with respect to such amount of the commodity as is used in the manufacture of such products." See 7 USCA § 615 (a).

"(d) The Secretary of Agriculture shall ascertain from time to time whether the payment of the processing tax upon any basic agricultural commodity is causing or will cause to the processors thereof disadvantages in competition from competing commodities by reason of excessive shifts in consumption between such commodities or products thereof. If the Secretary of Agriculture finds, after investigation and due notice and opportunity for hearing to interested parties, that such disadvantages in competition exist, or will exist, he shall proclaim such finding. The Secretary shall specify in this proclamation the competing commodity and the compensating rate of tax on the processing thereof necessary to prevent such disadvantages in competition. Thereafter there shall be levied, assessed, and collected upon the first domestic processing of such competing commodity a tax, to be paid by the processor, at the rate specified, until such rate is altered pursuant to a further finding under this section, or the tax or rate thereof on the basic agricultural commodity is altered or terminated. In no case shall the tax imposed upon such competing commodity exceed that imposed per equivalent unit, as determined by the Secretary, upon the basic agricultural commodity." 7 USCA § 615 (d).

"Sec. 16. (a) Upon the sale or other disposition of any article processed wholly or in chief value from any commodity with respect to which a processing tax is to be levied, that on the date the tax first takes effect or wholly terminates with respect to the commodity, is held for sale or other disposition (including articles in transit) by any person, there shall be made a tax adjustment as follows:

"(1) Whenever the processing tax first takes effect, there shall be levied, assessed, and collected a tax to be paid by such person equivalent to the amount of the processing tax which would be payable with respect to the commodity from which processed if the processing had occurred on such date.

"(2) Whenever the processing tax is wholly terminated, there shall be refunded to such person a sum (or if it has not been paid, the tax shall be abated) in an amount equivalent to the processing tax with respect to the commodity from which processed." See 7 USCA § 616 (a) (1, 2).

Power of Congress over Production of Agricultural Commodities.

It is clear from the above sections, together with the other sections of the

act, that its main purpose is to control and regulate the production of the so-called basic agricultural commodities in the several states, through agreements with the producers and in consideration of what is termed rental or benefit payments, to reduce acreage or production for market sufficient to increase the current average price of such products to that elusive point where the returns to the farmer from the production of such commodities will purchase under present conditions the same amount of industrial products that the returns to the farmer from the same products would buy in the five-year pre-war period from August, 1909, to July, 1914.

The "processing" and "floor taxes," though ostensibly imposed for raising funds to meet extraordinary expenses incurred by reason of the national economic emergency, are obviously intended to provide funds for the rental and benefit payments authorized under section 8, as such taxes are not imposed except when the Secretary determines that rental or benefit payments are to be made, and the proceeds are expressly appropriated for the purpose.

 It is urged by the receivers and in a brief filed by one of the amici curiæ that the restriction of the production of agricultural products is entirely within the control of the several states, and Congress cannot control it directly or indirectly through the Executive Department, however great the emergency; that, even if in a great emergency transactions in agricultural products become affected with a public interest, which is not met by concerted action by the states themselves, it does not lie within the power of Congress to regulate their production; that, however widespread the public interest in a matter solely within the control of the states themselves, Congress has no power to control or regulate it, it being reserved to the states under the Tenth Amendment.

The power of Congress to regulate interstate commerce does not authorize it to do so by taxing products either of agriculture or industry before they enter interstate commerce, or otherwise to control their production merely because their production may indirectly affect interstate commerce.

There is, of course, nothing new in this statement. See Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Child Labor Tax Case (Bailey v. Drexel Furni-

ture Co.), 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432; Chassaniol v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004; Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; Keller v. United States, 213 U. S. 138, 145, 29 S. Ct. 470, 53 L. Ed. 737, 16 Ann. Cas. 1066; New York v. Miln, 11 Pet. 102, 139, 9 L. Ed. 643; United Leather Workers' International Union, etc., v. Herkert & Meisel Trunk Co., 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566; United Mine Workers, etc., v. Coronado Coal Co., 259 U. S. 344, 408, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166; Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U. S. 210, 235, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403; United States v. Eason Oil Co. (D. C.) 8 F. Supp. 365; United States v. Weirton Steel Co. (D. C.) 10 F. Supp. 55.

In Hammer v. Dagenhart, supra, 247 U. S. 251, page 275, 38 S. Ct. 529, 532, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, the court said:

"A statute must be judged by its natural and reasonable effect. Collins v. New Hampshire, 171 U. S. 30, 33, 34, 18 S. Ct. 768, 43 L. Ed. 60. The control by Congress over interstate commerce cannot authorize the exercise of authority not entrusted to it by the Constitution. Pipe Line Cases, 234 U. S. 548, 560, 34 S. Ct. 956, 58 L. Ed. 1459. The maintenance of the authority of the states over matters purely local is as essential to the preservation of our institutions as is the conservation of the supremacy of the federal power in all matters entrusted to the nation by the federal Constitution.

"In interpreting the Constitution it must never be forgotten that the nation is made up of states to which are entrusted the powers of local government. And to them and to the people the powers not expressly delegated to the national government are reserved. Lane County v. Oregon, 7 Wall. 71, 76, 19 L. Ed. 101. The power of the states to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government. New York v. Miln, 11 Pet. 102, 139, 9 L. Ed. 648; Slaughter House Cases, 16 Wall. 36, 63, 21 L. Ed. 394; Kidd v. Pearson, supra. To sustain this statute would not be in our judgment a recognition of the law-

ful exertion of congressional authority over interstate commerce, but would sanction an invasion by the federal power of the control of a matter purely local in its character, and over which no authority has been delegated to Congress in conferring the power to regulate commerce among the states.

"We have neither authority nor disposition to question the motives of Congress in enacting this legislation. The purposes intended must be attained consistently with constitutional limitations and not by an invasion of the powers of the states. This court has no more important function than that which devolves upon it the obligation to preserve inviolate the constitutional limitations upon the exercise of authority, federal and state, to the end that each may continue to discharge, harmoniously with the other, the duties entrusted to it by the Constitution."

The government contends that Congress does not seek by the act to interfere with the states' control over agriculture, inasmuch as the reduction of acreage and of production of either of the basic agricultural products depends on voluntary agreements by the producers and the processing and floor taxes depend on the execution of such agreements to reduce production, citing Com. of Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078; but it is clear, we think, that, under the recent decision of the Supreme Court in the A. L. A. Schechter Poultry Corporation v. U. S., 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. ——, decided May 27, 1935, Congress at the outset has attempted to invade a field over which it has no control, since its obvious purpose, viz. to control or regulate the production of agricultural products in the several states by the methods adopted in this act, is beyond the power of Congress. State of Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956; Flint v. Stone Tracy Co., 220 U. S. 107, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. The processing and floor taxes are not dependent on the execution of agreements to reduce acreage or production alone, but on the determination by the Secretary without any foundation other than his own opinion that the existing economic emergency demands that to accomplish the declared purpose of the act rental or benefit payments shall be made. The imposing of the taxes automatically follows.

The issue is not, as the government contends, whether Congress can appropriate funds raised by general taxation for any purpose deemed by Congress in furtherance of the "general welfare," but whether Congress has any power to control or regulate matters left to the states and lay a special tax for that purpose.

Delegation of Legislative Powers.

The issue of whether under the act there has been an unauthorized delegation by Congress of its legislative powers is decisive of the case before this court.

Except as a premise for the conclusions which follow, it is unnecessary to restate what has been so often reiterated by the courts, viz. that the federal government is a government of enumerated powers, and Congress cannot delegate legislative powers to the Executive Department.

The line between grants of legislative powers and the authority to perform a purely administrative function as drawn in the decisions may at first blush appear wavy instead of straight, notwithstanding the rule has been often definitely stated.

The Supreme Court of Ohio, in Cincinnati, Wilmington, etc., R. Co. v. Clinton County Commissioners, 1 Ohio St. 77, 88, stated the rule in a form which has been approved by the Supreme Court of the United States, Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294, and again in the recent case of Panama Refining Co. et al. v. Ryan et al., 293 U. S. 388, 426, 55 S. Ct. 241, 248, 79 L. Ed. 446:

"The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

The Supreme Court in the Panama Refining Co. Case, supra, also said:

"The Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested. Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national Legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and prac-

ticality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility."

The court, however, added:

"But the constant recognition of the necessity and validity of such provisions and the wide range of administrative authority which has been developed by means of them cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained."

And in the case of Wichita R. R. & Light Co. v. Public Utilities Commission, 260 U. S. 48, 59, 43 S. Ct. 51, 55, 67 L. Ed. 124, the court said:

"In creating such an administrative agency, the Legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function."

It is the application of this principle to complex situations that sometimes makes it difficult to determine whether there has been a grant of legislative power to an administrative officer or merely administrative functions.

While the courts have always shown a desire to sustain, if possible, acts of Congress, they have recognized the limitations imposed on Congress in this respect under the Constitution.

In the leading case of Field v. Clark, 143 U. S. 649, supra, page 692, 12 S. Ct. 495, 504, 36 L. Ed. 294, the court said that the rule "that congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution."

Under stress of circumstances, we sometimes forget the reason for the division of our government into three independent branches, which was expressed in the Constitution of Massachusetts by one of those instrumental in securing the adoption of the Federal Constitution:

"In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men." (Const. Mass. pt. 1, art. 30).

The extent to which the court has gone in upholding the acts of Congress upon the ground that Congress may select instrumentalities for the purpose of ascertaining the existence of facts upon which the operation of the law depends and may properly give authority to administrative officers to determine certain facts and, by establishing primary standards, devolve on others the duty to carry out the declared legislative policy in accordance therewith, is shown in the following cases: The Brig Aurora v. U. S., 7 Cranch, 382, 3 L. Ed. 378; Field v. Clark, supra; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131; Federal Radio Commission v. Nelson Brothers Co., 289 U. S. 266, 53 S. Ct. 627, 77 L. Ed. 1166; United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; Hampton, Jr. & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 34 S. Ct. 359, 58 L. Ed. 713; United States v. Shreveport Grain & El. Co., 287 U. S. 77, 53 S. Ct. 42, 77 L. Ed. 175; Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202; Williamsport Wire Rope Co. v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985; St. Louis, Iron Mountain & Southern Rwy. Co. v. Taylor, 210 U. S. 281, 287, 28 S. Ct. 616, 52 L. Ed. 1061.

But an examination of these decisions and others of the Supreme Court will also disclose that, when an act of Congress of this nature has been sustained, either there has been a clear direction to perform an administrative function or to add a tax of the same character to one already imposed by Congress, Milliken v. United States, 283 U. S. 15, 24, 51 S. Ct. 324, 75 L. Ed. 809; Patton v. Brady, 184 U. S. 608, 22 S. Ct. 493, 46 L. Ed. 713, or to grant relief from an excessive tax already imposed, Williamsport Wire Rope Co. v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985; Heiner v. Diamond Alkali Co., 288 U. S.

502, 53 S. Ct. 413, 77 L. Ed. 921, or a power to determine, after notice and hearing, certain facts upon which the operation of congressional edicts are made to depend, particularly when the determination of the facts are dependent on data not within the knowledge of Congress, or not readily accessible, and the ultimate facts on which the will of Congress depends can only be determined from evidentiary facts to be proved by evidence, which cannot be fairly weighed except by permanent and specially qualified officials, such as the Interstate Commerce Commission, the Commissioner of Internal Revenue, the Board of Tax Appeals, the Radio Commission, or the Tariff Commission, and from the findings of which commission judicial review is provided for, Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431.

The power to determine what the law shall be, what property shall be affected by taxation or regulation, and what standards shall govern the administrative officers in administering acts of Congress has never been held to be an administrative function. The power to impose a tax and to determine what property shall bear the tax can only be determined by the legislative department of the government. If Congress undertakes to lay down a guide for an administrative officer to follow in carrying out its mandates, it must be by an intelligible and a reasonably definite standard. Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238; Hampton, Jr. & Co. v. United States, supra, 276 U. S. 394, page 409, 48 S. Ct. 348, 72 L. Ed. 624. The balance between production and consumption of certain commodities, or the equalizing of the purchasing power thereof between certain widely separated periods alone forms no such standard.

Congress, in the National Recovery Act, title 1, 15 USCA § 701 et seq., authorized the President to prohibit the transmission of oil in interstate commerce in excess of the amount authorized by a state, which on its face might seem definite, but the court said, in the Panama Refining Co. Case, supra, 293 U. S. 388, page 415, 55 S. Ct. 241, 246, 79 L. Ed. 446:

"The question whether that transportation shall be prohibited by law is obviously one of legislative policy. Accordingly, we look to the statute to see whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition. * * * Section 9 (c) [15 USCA § 709 (c)] does not state whether or in what circumstances or under what conditions the President is to prohibit the transportation of the amount of petroleum or petroleum products produced in excess of the state's permission. It establishes no criterion to govern the President's course. It does not require any finding by the President as a condition of his action."

The court found no standard in that act by which the President's action was to be governed except a general declaration in section 1 (15 USCA § 701) of a policy even broader than that contained in section 2 of this act (15 USCA § 702). The court said of section 1 of the Recovery Act, 293 U. S. 388, page 417, 55 S. Ct. 241, 247, 79 L. Ed. 446:

"This general outline of policy contains nothing as to the circumstances or conditions in which transportation of petroleum or petroleum products should be prohibited—nothing as to the policy of prohibiting or not prohibiting the transportation of production exceeding what the states allow. * * * It is manifest that this broad outline is simply an introduction of the act, leaving the legislative policy as to particular subjects to be declared and defined, if at all, by the subsequent sections."

If Congress has the power to control or regulate the production of agricultural products within the several states and assess a tax on their processing or sale for that purpose, it is obviously legislative in character. Query, then, has Congress set up any definite standard for the Secretary's action in making rental or benefit payments to producers and thereby imposing a processing tax?

We find no definite intelligible standard set up in the act for determining when the Secretary shall pay rental or benefit payments in order to reduce production of any particular commodity except his own judgment as to what will effectuate the purpose of the act.

The Declaration of Emergency in the Agricultural Adjustment Act § 1 (7 USCA § 601) contains no such standard for the Secretary of Agriculture to follow in en-

tering into restrictive agreements with producers of agricultural products. It is merely a statement of conditions which in the judgment of Congress warranted legislative action. Section 2 of the act (7 USCA § 602) declaring the policy of Congress in enacting the legislation contains no more than a statement of the objects Congress had in view in passing the act, viz.: "To establish and maintain a balance between the consumption and production of agricultural commodities and such marketing conditions therefor as will reestablish prices to farmers at such a level as will give agricultural commodities a purchasing power with respect to articles that farmers buy equivalent to the purchasing power of agricultural commodities during the five year pre-war period from August 1909 to July 1914." We can conceive of no goal that can be more elusive and difficult of attainment.

Without requiring any findings to warrant his action, Congress has empowered him, in conjunction with the producers, to determine when a reduction of acreage or production of any one of the agricultural commodities which it has termed basic should be resorted to to accomplish the purpose of the act, when rental or benefit payments are to be made, and in what amounts, and thereby to determine through the initiation of the benefit payments or rentals the consequent imposition of a tax.

The making of benefit payments, therefore, rests upon, and the consequent imposition of the tax is vested in the discretion of, the Secretary, in conjunction, of course, with the producers, governed by no other consideration than the general purpose of Congress to equalize the purchasing power of certain agricultural products. The carrying out of the policy stated by Congress in section 2 is no more definite as a standard by which the acts of the Secretary are determined than the policy expressed in the National Recovery Act title 1, 15 USCA § 701 et seq., as to transportation of oil and the power vested in the President to prescribe industrial business codes governing the conduct of business.

What the Supreme Court said of section 9 (c) of the National Recovery Act (15 USCA § 709 (c) in the Panama Refining Co. Case may likewise be said of section 2 of the Agricultural Adjustment Act, 7 USCA § 702, and section 8, as amended, 7 USCA § 608. Neither section 2 nor section 8 of this act states whether or under what circumstances the Secretary shall enter into agreements to limit production of basic agricultural commodities. Action by the Secretary is not mandatory, and the act establishes no criterion to govern his course of action. It requires no finding by him as a condition of his action, nor is any provision for judicial review provided in the act in case of a finding that such standard in fact exists. It is true that the facts in this case are different from those in the Panama Refining Co. Case and in the Schechter Poultry Case, but the provisions defining the acts of the Secretary differ from those authorizing the acts of the President in those cases only in the general terms employed. The principle involved is the same.

The indefiniteness of the standard by which the Secretary of Agriculture is to proceed is at once apparent and was recognized by Congress in paragraphs (2) and (3) of section 2, 7 USCA § 602 (2, 3), in which it was provided that the approach to such equality of purchasing power must be by a *gradual* correction of the present inequalities at as rapid a rate *as is deemed feasible* by the Secretary in view of the current consumptive demand in the domestic and foreign markets, and, further, by protecting the consumers' interest by readjusting farm production at such a level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities which is returned to the farmer above that returned to him during the five-year pre-war period.

As originally enacted, Congress enumerated in section 11 seven products which it termed basic, and later by amendment added rye, flax, barley, grain, sorghum, sugar beets, sugar cane, peanuts, and rice (7 USCA § 611). Benefit payments under the act have been made with respect to wheat, cotton, tobacco, hogs, field corn, and peanuts, but none with respect to barley, cattle, flax, grain, sorghum, milk, or rye. Congress has not specifically directed that payments should be made to the producers of any one of them except the producers of sugar, or that the processing of any one of these products should be taxed except rice; but, as to each of the other commodities enumerated, has left it to the Secretary of Agriculture to determine by agreements with the producers themselves which ones, if any, should receive benefit or rental payments and in what amounts.

The Secretary made no findings of fact as to why he selected the first list of basic commodities for reducing acreage or production, and was not required to do so. He simply made a proclamation that "rental and/or benefit payments are to be made with respect to cotton," and a processing tax automatically followed.

It cannot be said that the Secretary's judgment that his acts will tend to effectuate the general policy laid down by Congress can be called a finding, as his judgment involves merely his opinion as to the general effect of the agreements he executes to equalize the purchasing power of the commodity in question with that of the five-year pre-war period. Only when he undertakes to readjust taxes is he supposed to make findings, but in that case it amounts to no more, as the court said in the Schechter Poultry Corporation Case of the President's code-making powers under the National Recovery Act, than his opinion as to its effect in promoting the general policy outlined by Congress in the act itself.

To quote from the opinion in the Schechter Poultry Corporation Case, decided May 27, 1935:

"But would it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? Could trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises? And could an effort of that sort be made valid by such a preface of generalities as to permissible aims as we find in section 1 of title 1 [15 USCA § 701]? The answer is obvious. Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress."

Because the proposed reduction of acreage and of production of the so-called basic agricultural commodities is to be secured through voluntary agreements, the government also contends that Congress has not delegated legislative powers to the Secretary; but can Congress, in order to effectuate the general policy expressed in section 2 of the act (7 USCA § 602), lawfully delegate to the Secretary the power to determine whether, in consideration of rental or benefit payments to the producers, the production of any one of such basic agricultural commodities shall be reduced and to what extent reduced, without a finding by the Secretary that facts exist requiring a reduction of the acreage and of production of such agricultural commodity, or without some standard fixed by Congress by which action by the Secretary shall be determined, and further provide that upon his determination to pay such rental or benefit payments a tax shall be automatically imposed on the processing of such commodity for the purpose of providing revenue for such rental or benefit payments? We think not.

While the amount of the reduction of acreage or production of any basic commodity under this act is done by agreements and not by a code, the purpose and result is the same, viz. the control and regulation of a great intrastate industry, and the Secretary with the approval of the President is authorized to make regulations for carrying out the powers vested in him and imposing a penalty for their violation.

If Congress can take over the control of any intrastate business by a declaration of an economic emergency and a public interest in its regulation, it would be difficult to define the limits of the powers of Congress or to foretell the future limitations of local self-government.

But these are not the only powers vested in the Secretary under the act. When a tax shall first be imposed on a processing of such commodity depends on the joint action of both the Secretary and the producer; but, if the Secretary finds *or has reason to believe* that a tax determined in accordance with the statistics in the Agricultural Department as to the purchasing power of such commodities in the two contrasting periods will cause such a reduction in the quantity of the commodity or products thereof domestically consumed as to result in an accumulation of surplus stocks of the commodity and in the depression of the farm price of the commodity, and if he finds, after hearing, that such result has occurred, he may make a new rate that will prevent an accumulation of such commodity or a depression of farm prices. In readjusting the rate of tax there is no mathematical formula or standard provided in the act to guide the Secretary except the indefinite one of prevent-

ing an accumulation of surplus stock of any of the basic commodities or a depression in farm prices. A finding or conclusion by the Secretary, after hearing, that the readjustment of the tax would carry out the congressional policy by preventing the accumulation of a surplus of the commodity, amounts to no more than an expression of his opinion.

If it could be urged that there is a standard set up in section 9 of the act, as amended, 7 USCA § 609, for determining the amount of the processing tax, viz. the equalizing of the purchasing power of the basic commodities with the pre-war period, it requires readjustments to such an extent as to render the standard so indefinite as to leave it entirely in the discretion of the Secretary what the amount shall be to accomplish that purpose.

He is also given authority to impose what is termed compensating taxes; that is, if the Secretary, after notice and hearing, finds that any competing commodity will cause the processors disadvantage from such competition by reason of excessive shifts in consumption between such commodities or the products thereof, he may specify the competing commodity and a compensating processing tax on the competing commodity necessary to prevent such disadvantage.

No standard or guide is here laid down to determine how the compensating tax shall be fixed or what elements shall be taken into consideration in determining the amount, except that it shall be determined by the amount necessary to prevent such disadvantage in competition. We find no decision of the Supreme Court authorizing such a delegation of power to an administrative officer. On the contrary, the recent decision in the Panama Refining Co. Case and the Schechter Poultry Corporation Case, we think, clearly condemn it as unwarranted under the Constitution.

It is not contended that the receivers have been adversely affected by these last two provisions, and is adverted to for the purpose of showing the extent to which Congress has attempted to vest legislative power in the Secretary.

It is not difficult to understand, after studying the act, why the District Court (8 F. Supp. 552; 559) concluded that "It must * * * be conceded that legislative functions are conferred upon administrative officers by the act," or that "The Agricultural Adjustment Act indubitably authorizes an executive to exercise powers of a legislative character."

The District Court, however, hesitated to hold the authority vested in the Secretary was an unlawful delegation of legislative power because no decision of the Supreme Court at the time of his decision had held any of the recent acts of Congress unconstitutional on this ground. Since that time, however, the case of Panama Refining Co. and the Schechter Poultry Corporation Case have been decided.

Processing and Floor Taxes.

Upon determining that benefit payments are to be made to the producers, the Secretary is further vested with the power to fix the amount of the processing tax on any commodity provided for in section 16, as amended, 7 USCA § 616, and at a rate that will equal the difference between the current average farm price for the commodity and its fair exchange value during the five-year pre-war period, which fair exchange value is to be determined by him from statistics in the Department of Agriculture.

If the District Court, however, understood the receivers as agreeing that the Secretary had correctly followed the mandate of Congress in fixing the tax in the first instance, or as waiving any claim that he had in this respect acted outside the powers vested in him under the act, then, although he appears for some reason outside of what is termed a mathematical formula based on the statistics of the Agricultural Department, to have fixed a tax at 4.2 cents per pound, when the mathematical application of the statistics in the Agricultural Department would establish the rate of the tax at 4.34 cents per pound, the error cannot be taken advantage of in this court.

If Congress has invaded a field over which it has no control under the Constitution, or the Secretary has been unlawfully vested with legislative powers, the exercise of which has affected these appellants, it is not necessary to consider whether the processing and floor taxes are direct taxes, or, if excise taxes, are not uniformly laid.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to enter a decree for the appellants.

BINGHAM, Circuit Judge, dissents.