FILED
United States Court of Appeals
Tenth Circuit

June 16, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

JERROLD ALBERT CHAVARRIA;
JERRY ANTOCIO ROMERO,

    Defendants - Appellees.

No. 23-2102

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 2:22-CR-01724-KG-1)**
_____

Michael A. Rotker, Attorney, Appellate Section, United States Department of Justice, Washington, D.C. (Nicole M. Argentieri, Acting Assistant Attorney General, Criminal Division, and Lisa H. Miller, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C.; Alexander M.M. Uballez, United States Attorney, District of New Mexico, Albuquerque, New Mexico; C. Paige Messec, Appellate Chief, United States Attorney's Office, District of New Mexico, Albuquerque-Santa Fe Metropolitan Area, New Mexico; and Ryan Ellison and Maria Y. Armijo, Assistant United States Attorneys, District of New Mexico, Las Cruces, New Mexico, with him on the briefs) for Plaintiff-Appellant.

Jacob Rasch-Chabot, Assistant Federal Public Defender, Office of the Federal Public Defender, Denver, Colorado, and Kenneth Del Valle, El Paso, Texas (Virginia L. Grady, Federal Public Defender, Office of the Federal Public Defender, Denver, Colorado, with them on the brief) for Defendants-Appellees.
_____

Before **HARTZ**, **TYMKOVICH**, and **BACHARACH**, Circuit Judges.
_____

_____

**TYMKOVICH**, Circuit Judge.

_____

Then-Senator Joseph Biden once remarked that "we federalize everything that walks, talks, and moves."[1]  In this case, the government seeks to add "everything that drives" to the list.

Defendants Jerrold Chavarria and Jerry Romero are alleged to have kidnapped and brutally murdered a woman in Eddy County, New Mexico.  Instead of state kidnapping charges, Mr. Chavarria and Mr. Romero were charged with the federal crime of kidnapping resulting in death.  18 U.S.C. § 1201(a).  But kidnapping is normally a state crime for a reason.  *Federal* crimes require some sort of jurisdictional hook to sort the prohibited activity into one of the government's enumerated and limited powers, such as its power over interstate commerce.

The superseding indictment alleged that "in committing and in furtherance of the commission of the offense, [Mr. Chavarria and Mr. Romero] used a motor vehicle, a means, facility, and instrumentality of interstate commerce."  App. R. 12.  But it lacked any details about how this kidnapping affected commerce in any way.  The district court dismissed the superseding indictment because it lacked an adequate nexus to interstate commerce.  We agree with the district court.

_____

[1] Edwin Meese, *The Dangerous Federalization of Crime*, WALL ST. J. (Feb. 22, 1992, 12:01 AM), https://www.wsj.com/articles/SB919463095836917000.

Allowing the government to bring charges based on the use of any ordinary motor vehicle (here, a Jeep) to commit a purely intrastate crime would transform any crime that uses a vehicle into a federal matter. For this indictment to be valid, it must be true that *every* motor vehicle is a "means, facility, and instrumentality of interstate commerce." We hold they are not. That interpretation—unbound by a cognizable limiting principle—stretches Congress's authority beyond the Constitution's boundaries. We therefore **AFFIRM** dismissal of the superseding indictment.[2]

## I.    Background

Around 2:20 in the morning, video cameras outside a Budget Inn motel in Artesia, New Mexico captured a red Jeep Cherokee Latitude pull into the parking lot. Mr. Chavarria, Mr. Romero, and a young woman exited the Jeep and rented a room. About two hours later, Mr. Romero escorted the now-sobbing young woman back into the Jeep. Mr. Chavarria followed and drove the threesome south on Highway 285 into rural New Mexico.

Three hours later, the Jeep returned to the motel parking lot. This time, however, only Mr. Chavarria and Mr. Romero got out. Five hours later, the owner of an oil lease located eleven miles south of Artesia off Highway 285 called 911 to

---

[2] This does not mean Mr. Romero and Mr. Chavarria are off the hook for their alleged crimes. The question is only who should prosecute them—the federal government or the State of New Mexico? The State originally charged them with first-degree kidnapping, in violation of N.M. Stat. § 30-4-1(A), (B). It only dismissed those charges (without prejudice) after they were federally indicted. Aplt. Br. 9–10. "[I]ndeed, New Mexico remains free today to prosecute the defendants for their conduct if it wishes to do so." *Id.* at 30.

report the lifeless body of a young woman lying on the ground near a pump jack.

New Mexico Sheriff's Office deputies subsequently identified her as the same

woman seen in the motel video footage. An autopsy later revealed she had been shot

twenty-one times with a rifle and suffered other severe physical traumas. Near her

body, officers discovered a cigarette butt with Mr. Chavarria's DNA, tire track

imprints matching the Jeep, and shoe imprints consistent with those worn by Mr.

Romero.

On February 22, 2023, a federal grand jury returned an indictment charging

Mr. Chavarria and Mr. Romero with federal kidnapping resulting in death. 18 U.S.C.

§ 1201(a)(1). Mr. Romero moved to dismiss the superseding indictment, and Mr.

Chavarria adopted the motion. The district court granted the motion after

determining it insufficiently alleged use of an instrumentality of interstate commerce.

The government timely appealed.

## II.     Discussion

### A.     Standard of Review

We review de novo embedded issues of law resolved in connection with the

district court's dismissal of an indictment. *See United States v. Kemp & Assocs.,

Inc.*, 907 F.3d 1264, 1270 (10th Cir. 2018); *United States v. Wells*, 873 1241, 1253

(10th Cir. 2017). "Ordinarily, a district court's order dismissing an indictment is

reviewed for abuse of discretion, but if the dismissal is based on the court's

'interpretation of governing statutes,' we review it de novo." *United States v. Friday*,

525 F.3d 938, 949 (10th Cir. 2008) (quoting *United States v. Thompson*, 287 F.3d 1244, 1248–49 (10th Cir. 2002)).

Because the dismissal here was based on the legal determination that a "motor vehicle" was not per se an "instrumentality of interstate commerce" under the federal kidnapping statute, 18 U.S.C. § 1201(a), our review is de novo.

### B.        *"Instrumentalities of Interstate Commerce"*

Congress passed the Federal Kidnapping Act in 1932 in the wake of a nationwide kidnapping crime wave, including the infamous kidnapping of the "Lindbergh baby." *Chatwin v. United States*, 326 U.S. 455, 462–63 (1946). Kidnapping becomes a federal crime if the offender uses an "instrumentality of interstate commerce in committing or in furtherance of the offense." 18 U.S.C. § 1201(a). In relevant part, the Act provides:

> Whoever    unlawfully . . . kidnaps . . . any    person . . .
> when. . . the offender . . . uses . . . any means, facility, or
> *instrumentality of interstate or foreign commerce* in
> committing or in furtherance of the commission of the
> offense . . . shall be punished by imprisonment for any term
> of years and, if the death of any person results, shall be
> punished by death or life imprisonment.

*Id.* (emphasis added).

The government's superseding indictment sought to meet that statute by alleging that Mr. Chavarria and Mr. Romero, "in furtherance of the commission of the offense, used a motor vehicle, a means, facility, and instrumentality of interstate commerce." App. R. 12. In full, it read:

5

> On or about February 26, 2021, in Eddy County, in the District of New Mexico, the defendants, JERROLD ALBERT CHAVARRIA and JERRY ANTOCIO ROMERO, did unlawfully and willfully seize, confine, kidnap, abduct, carry away, and hold Jane Doe for some purpose and benefit, and, in committing and in furtherance of the commission of the offense, used a *motor vehicle*, a means, facility, and *instrumentality of interstate commerce*, and, as to Jane Doe, death resulted.  In violation of 18 U.S.C. §§ 1201(a)(1) and 2.

App. R. 12 (emphases added).[3]

The government argues the district court erred since motor vehicles are instrumentalities of interstate commerce.  Defendants concede *some* are, but argue *all* are not, meaning this superseding indictment was insufficient as applied.

For the reasons explained below, we agree with Mr. Chavarria and Mr. Romero and affirm the district court.

### 1.    *Commerce Clause*

"[T]he Constitution does not grant the federal government a police power or a general authority to combat violent crime."  *United States v. Patton*, 451 F.3d 615, 618 (10th Cir. 2006).  Since our nation's founding, the federal government's ability to punish crime arose only from its enumerated powers.  *See Cohens v. Virginia*, 19 U.S. 264, 425 (1821) ("Congress has a right to punish murder in a fort, or other place

---

[3] "Instrumentalities of interstate commerce" are "the means of interstate commerce." *United States v. Patton*, 451 F.3d 615, 621 (10th Cir. 2006).  The two are coextensive.  But neither party has briefed what a "facility" of interstate commerce is, nor is it relevant to our analysis—so we decline to address that term.

within its exclusive jurisdiction; but no general right to punish murder committed within any of the States.").

One such power is the Constitution's Commerce Clause. The Commerce Clause provides "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. While "Congress's power to regulate commerce among the states is broad, federalism concerns limit it." *United States v. Durham*, 902 F.3d 1180, 1198 (10th Cir. 2018). "Congressional power 'may not be extended so as to . . . obliterate the distinction between what is national and what is local.'" *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 551 (1995)).

In its first incarnation, the national government did not have an equivalent to the Commerce Clause power under the Articles of Confederation. ARTICLES OF CONFEDERATION of 1781, art. IX, para. 1 (forbidding any "treaty of commerce . . . whereby the legislative power of the respective states shall be restrained from imposing [certain] imposts and duties on foreigners . . ."). But the difficulties of interstate coordination and pressure from foreign powers were so obvious that when the clause was presented at the Philadelphia Constitutional Convention, it was adopted without debate.[4]

---

[4] Max Farrand, 2 THE RECORDS OF THE FEDERAL CONVENTION of 1787 (Madison) 308 (1911).

Knowing why the clause was adopted, however, does not inform us of its meaning or its bounds. "This remarkable consensus suggests that for all concerned the provision had some common core of meaning, that it was understood as supplying some manifest defect in the existent congressional powers under the confederation."[5] But unfortunately, this consensus also "militated against the conscious articulation of that meaning, there being no need to elaborate what all understood and none opposed."[6] Still, the Framers often spoke of commerce in three contexts: (1) "customs and revenue," meaning fiscal regulation of imports and exports; (2) maritime or navigation regulations; and (3) regulation of mercantile enterprises.[7]

Many modern scholars have argued that the term "'commerce' was limited to the 'trade and exchange' of goods and transportation for this purpose."[8] "Commerce" in this sense was often used interchangeably with "trade." *Lopez*, 514

---

[5] Albert S. Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 807 MINN. L. REV. 432, 446 (1941).

[6] *Id.*

[7] *Id.* at 446–65 (collecting sources) ("These three large classes of subjects—fiscal regulation as to imports and exports, navigation, 'mercantile' enterprises are the only ones that there is any evidence for believing were thought of by any one as embraced within 'commerce' or affected by the grant of power to regulate it.").

[8] *See* Randy E. Barnett, *The Original Meaning of the Commerce Clause*, 68 U. CHI. L. REV. 101 (2001); Richard A. Epstein, *Constitutional Faith and the Commerce Clause*, 71 NOTRE DAME L. REV. 167, 169–70 (2014).

U.S. at 585–87 (Thomas, J., concurring) (collecting sources).  And it was often contradistinguished from "manufacturing" and "agriculture."  *Id.*[9]

Thirty-five years after ratification it became "necessary to settle the meaning of the word" commerce.  *Gibbons v. Ogden*, 22 U.S. 1, 189 (1824).  Chief Justice Marshall explained:

> Commerce, undoubtedly, is traffic, but it is something more: it is intercourse.  It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. The mind can scarcely conceive a system for regulating commerce between nations, which shall exclude all laws concerning navigation, which shall be silent on the admission of the vessels of the one nation into the ports of the other, and be confined to prescribing rules for the conduct of individuals, in the actual employment of buying and selling, or of barter.

*Id.* at 189–90.

The scope of the Commerce Clause has grown far beyond these modest bounds.  *See, e.g.*, *Wickard v. Filburn*, 317 U.S. 111 (1942).  The Court has "identified three broad categories of activity that Congress may regulate under its commerce power."  *Lopez*, 514 U.S. at 558 (citing *Perez v. United States*, 402 U.S. 146, 150 (1971)).  "First, Congress may regulate the use of the channels of interstate commerce."  *Id.*  "Second, Congress is empowered to regulate and protect the *instrumentalities* of interstate commerce, or persons or things in interstate commerce,

---

[9] *See, e.g.*, *Kidd v. Pearson*, 128 U.S. 1, 20 (1888) (distinguishing commerce from manufacturing); THE FEDERALIST NOS. 12, 21, and 36 (Alexander Hamilton) (P. F. Collier & Son, 1901) (distinguishing or referring separately to manufacturing, commerce, and agriculture).

even though the threat may come only from intrastate activities." *Id.* (emphasis added). "Finally, Congress's commerce authority includes the power to regulate those activities which have a substantial relation to interstate commerce . . . ." *Id.* at 558–59. We refer to these categories of authority as Category 1, Category 2, and Category 3, respectively. *See United States v. Morgan*, 748 F.3d 1024, 1031–32 (10th Cir. 2014).

Using these powers, Congress has increasingly stretched its hand to add federal punishment to crimes that were traditionally within the exclusive control of the states, such as carjacking, arson, or in this case, kidnapping.[10]

Congress's reference to the "instrumentalities of interstate commerce" in the federal kidnapping statute invokes federal jurisdiction under the *Lopez* Category 2 authority. This case requires us to determine the scope of that authority.[11]

### 2.    *Instrumentalities*

As used here, "instrumentality of interstate commerce" is a judge-defined term of art. "When Congress amended the statute in 2006 to include kidnappings where the offender used an 'instrumentality of interstate or foreign commerce,' it clearly

---

[10] *See generally*, Erin C. Blondel, *The Structure of Criminal Federalism*, 98 NOTRE DAME L. REV. 1037, 1049 (2023); Sam J. Ervin III, *The Federalization of State Crimes: Some Observations and Reflections*, 98 W. VA. L. REV. 761, 761 (1996).

[11] Perhaps under the current expansive understanding of the Category 3 authority, Congress could regulate kidnapping as an activity which, in the aggregate, influences interstate commerce. *See Wickard*, 317 U.S. at 111. But the federal kidnapping statute contains no reference to that authority, and the government has not made such an argument here.

intended that the term have its specialized meaning." *Durham*, 902 F.3d at 1197; *see also Yellen v. Confederated Tribes of Chehalis Rsrv*., 594 U.S. 338, 354 (2021) ("[T]his Court reads statutory language as a term of art only when the language was used in that way at the time of the statute's adoption.").

"[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014). "[A]s Justice Frankfurter colorfully put it, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)). Put simply, "[i]n the absence of contrary indication, we assume that when a statute uses such a term, Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).

Knowing that "instrumentality of interstate commerce" is a term of art, however, does little work in telling us what limits its scope or outer bounds. Neither we nor the Supreme Court has expressly defined or limited the term.

Take *Gibbons*—dealing with interstate and intrastate steamboat navigation— the first case to introduce the term into our judicial lexicon:

> The power [Congress] possesses as to ships or vessels, is only in so far as they are instruments of foreign commerce, or of that between the different States; but in so far as the

11

> employment of a ship or vessel in navigating the waters of any State or States, has no connexion with the commerce which Congress has power to regulate; neither that employment, nor its regulation or prohibition, falls within the purview of the federal constitution.

22 U.S. at 94–95. The Court later recognized that technological advancements would not be a problem. The Court in 1887 determined that telegraph lines were instrumentalities of interstate commerce, explaining:

> The powers thus granted are not confined to the instrumentalities of commerce, or the postal service known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances. They extend from the horse with its rider to the stage-coach, from the sailing-vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances.

*Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. 1, 9 (1877). But the Supreme Court has not defined or delineated the term "instrumentalities of commerce." *Id.*

In our circuit, "[t]he 'instrumentalities' are the means of interstate commerce, such as ships and railroads, and the 'persons or things in interstate commerce' are the persons or things transported by the instrumentalities among the states." *Patton*, 451

12

F.3d at 621.[12]  Unfortunately, even this definition does little to define the outer parameters of the term.[13]

The government urges us to look to the dictionary definition of "instrumentality."  This is a helpful starting point, but ultimately an incomplete inquiry.  *In re Mallo*, 774 F.3d 1313, 1321 (10th Cir. 2014) (Dictionaries are a "useful touchstone[] to determine the 'ordinary meaning' of an undefined statutory term.").  Webster's Dictionary defines "instrumentality" as "something by which an end is achieved: MEANS."  *Instrumentality*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1172 (1971).  True enough, a motor vehicle[14] is a means to

---

[12]  "Congress may also regulate 'the persons or things that the instrumentalities are moving.'"  *Durham*, 902 F.3d at 1198.  But that does not mean these "persons or things" *become* instrumentalities.  Rather, they become regulatable only through their nexus to an instrumentality.

[13]  Our circuit is not the only one to have struggled in search of a concrete definition.  *See* 15A AM. JUR. 2D *Commerce* § 21 (2025) (collecting cases and noting certain items, such as railroads and the Internet, have been classified as a channel of interstate commerce, as well as an instrumentality of interstate commerce).

[14]  The government attempts to move away from the superseding indictment's reference to a "motor vehicle" by referring instead to "automobiles."  Aplt. Br. 12.  But the superseding indictment does not refer to "automobiles"—it refers to "motor vehicles."  The terms are not coextensive.  "Automobile" is a "4-wheeled automotive vehicle designed for passenger transportation on streets and roadways and commonly propelled by an internal-combustion engine using a volatile fuel (as gasoline)—called also *car*."  *Automobile*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 148 (1971) (emphasis added).  A "motor vehicle," in contrast, is "an automotive vehicle not operated on rails."  *Motor Vehicle*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1476.  "Automobile" is considerably narrower than "motor vehicle"— so we focus our analysis to the term "motor vehicle," the term used in the superseding indictment.

accomplishing an intended end.  But what end?  The government is satisfied merely that *some* "end" is accomplished.  That is too broad.

The Commerce Clause demands more.  If every "thing" that accomplishes an "end" falls within Congress's Category 2 Commerce Clause authority, then the federal government could regulate *everything* that moves.  The Constitution does not tolerate such extremities.  *Durham*, 902 F.3d at 1198 (citing *Lopez*, 514 U.S. at 551).

Our cases have always recognized limits of Congress's reach over instrumentalities.  "[N]ot all people and things that have ever moved across state lines qualify as permissible targets of regulation."  *Id.* (internal quotation marks omitted).  The government's reading ignores a critical limiting principle: an "instrumentality *of interstate commerce*" must actually serve the "end" of interstate commerce.  "Commerce" is the wellspring from which Congress's constitutional authority arises—not something's status as an instrumentality.

The government unfortunately recognizes the wrong distinction, conceding that the federal kidnapping statute "does not transform every kidnapping (or even every kidnapping in which an instrumentality of interstate commerce happens to be involved) into a federal crime."  Aplt. Br. 30.  Instead, the government's reading is that "the statute only reaches those kidnapping[s] where the abductor uses an instrumentality of interstate commerce to 'commit[]' or 'further' the crime."  *Id.*  The government's limiting principle would not attach jurisdictional significance to the use of instrumentalities where use is "merely incidental to the kidnapping and did not

14

facilitate the crime." *Id.* at 30–31.[15]  But that an instrumentality's use must further a crime does not relieve the government of its obligation to satisfy the Commerce Clause.  An instrumentality must affect interstate commerce in some way for its use to warrant federal interest.

###     3.     *Motor Vehicles as Instrumentalities of Interstate Commerce*

The question we must answer is whether "motor vehicles" are always presumed to be instrumentalities of interstate commerce.  We hold they are not.

We know that instrumentalities of interstate commerce embrace wide swaths of modern means of conveyance, and change with the times.  *See, e.g.*, *Pensacola*, 96 U.S. at 9.  Yet *Pensacola* did not say that any items which *could* be used for interstate commerce are automatically instrumentalities of interstate commerce.  In upholding Congress's authority, the Court took pains to explain that the "electric telegraph" had "*become* one of the necessities of commerce."  *Id.* (emphasis added).  Important to the Court's reasoning was that "more than eighty per cent of all the messages sent by telegraph related to commerce."  *Id.*

---

[15]  Put aside for a moment the government's internal inconsistency that being "incidental" to the kidnapping means jurisdiction will not attach, but being "incidental" to commerce apparently makes something an instrumentality. We agree that the abductor's use of an instrumentality in relation to the kidnapping matters. Under the government's own argument, the superseding indictment is insufficient since it alleges nothing about how Mr. Chavarria and Mr. Romero "used" a motor vehicle—only that they did so "in committing and in furtherance of the commission of the offense."  App. R. 12.  To draw those distinctions, *some* allegation of how an instrumentality is used is necessary.  For example, transporting an abductee in a bus may be sufficient, while merely imprisoning him in the back of a decommissioned semi may not be.

The Court elsewhere applied similar logic in determining that railroads and aircraft were per se instrumentalities of interstate commerce. *Houston, E. & W.T.R. Co. v. United States*, 234 U.S. 342, 351–53 (1914) (Congress has authority "to prevent the *common* instrumentalities of interstate and intrastate commercial intercourse from being used in their intrastate operations to the injury of interstate commerce." (emphasis added)); *Perez*, 402 U.S. at 150 (referring to "aircraft" as "the instrumentalities of interstate commerce.").

These cases do not obviate *Gibbons*'s requirement that something actually be put to the *end* of interstate commerce to be an *instrumentality* of interstate commerce. *See Gibbons*, 22 U.S. at 194 ("It is not intended to say that these words ['commerce among the several states'] comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States."). They only recognize that specific instrumentalities commonly or categorically serve as instruments of interstate commerce.

Certain items—by virtue of their class and with judicial economy in mind—permit the reasonable inference that they are per se instrumentalities of interstate commerce. When *Pensacola* was decided, telegraphs were overwhelmingly used for commercial transactions.[16] Trains and aircraft are similarly used almost exclusively

---

[16] *Pensacola* recognized that the "instrumentalities of commerce . . . keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances." 96 U.S. at 9. The implication is not only that things can

16

for the commercial transportation of people or goods—*i.e.*, interstate commerce. *See United States v. Bishop*, 66 F.3d 569, 598 (3d Cir. 1995) (Becker, J., dissenting) ("The regulation of air and rail travel is simply not a valid analogy. Such federal regulation is proper since both airplanes and trains are, nearly exclusively, used as instrumentalities of interstate commerce—that is, air and rail travel involves, overwhelmingly, the *sale* of both inter- and intra-state transportation services for persons and/or cargo."). The precise planning and careful coordination between the states required for air and rail traffic sets those modes of transportation apart as uniquely interstate. Motor vehicles are not automatically and always members of that class.

Recall that a "motor vehicle" is "an automotive vehicle not operated on rails." *Motor Vehicle*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1476; *see supra* note 14. Not every motor vehicle is essential to, or predominantly used for, commerce. In fact, many bear *no* cognizable relationship to commerce. What about e-bikes? Lawnmowers? Electric scooters? Elevators? Motorized Wheelchairs? With enough imagination, one might fathom a way these "motor vehicles" could be used for interstate commerce—but we do not think we can infer, as a class, that they are interstate instrumentalities.

In fact, ships and airplanes are "automotive vehicles not operated on rails." It makes little sense that the Court would delineate those subclasses of the broader

---

transform *into* instrumentalities, but also that they can transition *away* from being an instrumentality as they are used less for commerce and more for personal use.

17

"motor vehicle" phylum when reference to the broader group would suffice. The Court's explicit recognition of objects along a classification hierarchy suggests that "motor vehicle" is overbroad to be per se considered an instrumentality of interstate commerce. We will not infer that every "motor vehicle" is an instrumentality just because many are. *Gibbons*, 22 U.S. at 194–95.

We are convinced again by the lack of a limiting principle. Going on a picnic? Taking your child to school? Visiting a relative? Riding an ATV along a backwoods trail? Simply enjoying the open road? Under the government's view, all these may be federally regulated on the mere basis that they require *use* of a motor vehicle, no matter what that use is.

Resisting this conclusion, the government directs us to *United States v. Windham*, 53 F.4th 1006, 1013 (6th Cir. 2022) (citing cases) ("This Court has held repeatedly and unambiguously that cars and phones are instrumentalities of interstate commerce."), and *United States v. Protho*, 41 F.4th 812, 828–29 (7th Cir. 2022) ("automobiles" are per se "instrumentalities of interstate commerce" for purposes of the federal kidnapping statute).[17]

---

[17] The government also indicates that other courts have reached the same conclusion under similarly worded criminal statutes, including the carjacking and the murder-for-hire statutes. *See*, *e.g.*, *United States v. Mandel*, 647 F.3d 710, 716–21 (7th Cir. 2011); *United States v. Cobb*, F.3d 319, 322 (4th Cir. 1998); *United States v. McHenry*, 97 F.3d 125, 126–27 (6th Cir. 1996); *United States v. Robinson*, 62 F.3d 234, 236–37 (8th Cir. 1995); *United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995).

Taking each in turn, *Windham* acknowledged "[n]either party points to a case in which a federal court directly addresses whether a *car* or cell phone that is not used on an interstate basis satisfies the statute's interstate commerce element."  53 F.4th at 1012 (emphasis added).  But it held that "[the defendant's] use of a cell phone and *automobile* satisfies § 1201(a)(1)'s interstate commerce requirements." *Id.* (emphasis added).  Relying on its own precedent, it determined "cars and phones are instrumentalities of interstate commerce." *Id.* (citing cases).  The Sixth Circuit did not go so far as to say *all* instrumentalities are regulatable, nor did it articulate any limiting principle.  But even if *Windham* might suggest that all cars are instrumentalities of interstate commerce, it does not follow that all motor vehicles are.

The same is true for *Protho*.  41 F.4th at 827–29.  *Protho* reasoned that the federal kidnapping statute does not ask courts "to consider each automobile's specific use in interstate commerce.  Instead, it's the *nature* of the regulated object's class (here, automobiles) rather than the particular *use* of one member of that class ([the defendant]'s Ford Explorer) that matters." *Id.* at 828 (emphasis in original).  Both cases held that when a car or an automobile is used in committing or in furtherance of a kidnapping for ransom, reward, or otherwise, the federal kidnapping statute applies. *Id.*; *Windham*, 53 F.4th at 1013.  But even if we assumed *Protho* and *Windham* were right that cars or automobiles fit the categorical approach, that would not automatically mean that "motor vehicles" do, too.

The problem will always be the generality at which one defines the group an object belongs to. *Protho* resolved this by defining "automobiles" as the relevant class for analytic purposes. The government here goes a step farther by arguing the entire universe of motor vehicles is subject to federal regulation. That sort of gradual creep would inevitably grant Congress a general police power under its Commerce Clause authority.

Judge Becker's dissent in *Bishop* is compelling on this point. 66 F.3d at 598–600. The issue in *Bishop* was the federal carjacking statute's constitutionality. The majority upheld the statute on the theory that "automobiles" are often used as instrumentalities of interstate commerce. In the dissent's view, the majority "dramatically and improperly enhance[d] the scope of federal power under [the instrumentalities] branch of Congress's Commerce Clause authority." *Id.* at 599. But "[t]he fact that automobiles can be used as instrumentalities of interstate commerce does not grant Congress plenary authority to regulate the use and operation of every individual's automobile." *Id.* This result was also implied by *Lopez*, when the Court cited examples of "vehicles *used in interstate commerce*" alongside the more categorical "airplanes." 514 U.S. at 558 (emphasis added).

In sum, the government's cases are distinguishable based on their narrower level of generality ("car" and "automobile" vs. "motor vehicle"),[18] and their

---

[18] The degree of generality also distinguishes cases decided under the federal carjacking and murder-for-hire statute. *See* 18 U.S.C. § 2119 (limited to taking "a motor vehicle that has been transported, shipped, or received in interstate or foreign

perfunctory rationales are not persuasive.  The Supreme Court warned against categorically classifying instrumentalities that have no immediate connection to commerce more than 200 years ago in *Gibbons*.  22 U.S. at 95.

We follow *Gibbons*, where Chief Justice Marshall chastened that individual objects are "instruments" of commerce "only in so far" as they bear a connection "with the commerce which Congress has power to regulate."  *Id.*  But many motor vehicles are used only for non-commercial, intrastate purposes.  When used for those purposes, and without any other allegation of interstate commercial impact, "neither that employment, nor its regulation or prohibition, falls within the purview of the federal constitution."  *Id.* at 94–95.

This also accords with the Court's recognition that Congress's Commerce Clause "power is subject to outer limits."  *Lopez*, 514 U.S. at 556–57.  In fact, *Lopez* warned against "embrac[ing] effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."  *Id.* at 557; *see also Veazie v. Moor*, 55 U.S. 568, 573 (1852) (upholding a state-created steamboat monopoly because it involved regulation of only intrastate commerce); *Kidd*, 128 U.S. at 17 (upholding a state prohibition on the manufacture of liquor because the commerce power "does not comprehend the

---

commerce"); 18 U.S.C. § 1958(a) (limited to murder-for-hire involving "travel in interstate or foreign commerce" or "any facility of interstate or foreign commerce," specifically defined to include "means of transportation and communication.").

21

purely internal domestic commerce of a State which is carried on between man and man within a State or between different parts of the same State"). Recognizing congressional authority to regulate all "motor vehicles" is precisely the sort of creep in general applicability that would sanction federal overreach.

Without a doubt, kidnapping is a heinous crime. If Mr. Chavarria and Mr. Romero were alleged to have crossed state lines during the commission of their crime, a federal indictment would likely stand. That, after all, was the evil that the kidnapping statute was meant to prevent. *See Chatwin*, 326 U.S. at 462–63 ("Its proponents recognized that where victims were transported across state lines only the federal government had the power to disregard such barriers in pursuing the captors.").

But where a crime's relation to interstate commerce is so tangential that it can be connected only in the hypothetical by reference to the broadest possible conception of an instrumentality's class, prosecution must be left to the states. It is the states in whose hands our constitutional order places "the ordinary administration of criminal and civil justice."[19] The federal government must stay within its enumerated powers.

* * * * *

---

[19] THE FEDERALIST NO. 17, at 87 (Alexander Hamilton) (P. F. Collier & Son, 1901); *id.* at 85 (distinguishing between "[c]ommerce," a power "to be lodged in the national depositary," and "the administration of private justice between the citizens of the State, the supervision of agriculture and of other concerns of a similar nature . . . which are proper to be provided for by local legislation.").

To be an "instrumentality of interstate commerce," subject to Congress's Category 2 authority, an object must be more than just a means to an end. It must be a means to the end of *commerce*. What the government must allege to satisfy this requirement will vary based on the object used. Under binding case law, it need not do much. But it must do more than it did here.

We hold only that "motor vehicles"—an undefined, generic term—are not per se instrumentalities of interstate commerce for purposes of the federal kidnapping statute. Applied here, that means the government's threadbare, conclusory indictment is fatally deficient. *See* App. R. 12 ("in committing and in furtherance of the commission of the offense, [defendants] used a *motor vehicle*, a means, facility, and instrumentality of interstate commerce." (emphasis added)).[20]

## III.   Conclusion

We affirm the district court's dismissal of the superseding indictment.

---

[20] Consistent with settled principles of constitutional adjudication and judicial restraint, we need not proceed to the facial constitutionality of the federal kidnapping statute because we hold that motor vehicles are not per se means, facilities, or instrumentalities of interstate commerce under § 1201(a). *Hagans v. Lavine*, 415 U.S. 528, 549 (1974); *see also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").